**ORLOSKY INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–634C.

United States Court of Federal Claims.

Oct. 24, 2005.

Steven R. Lovett, Woodland Hills, CA, for plaintiff.

Timothy P. McIlmail, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Frank Kotarski, Naval Facilities Engineering Command, Western Division, of counsel.

## OPINION

CHRISTINE O.C. MILLER, Judge.

Only by barge or plane can one make his way to a small island miles off the coast of Southern California. Far from the scenic coast that is Point Mugu, California—no pre-award site visit tainted the contractor's perception—on the isolated island of San Nicolas, a constant influx of fog, cool temperatures, and high sustained winds adds to the challenge for those who call the U.S. Naval

Air Weapons Station at San Nicolas Island home. Plaintiff's owner is one who wishes that an extended stay had not been required.

The United States Department of the Navy (the "Navy") awarded Contract No. N62474–95–C–4778 to Orlosky Inc. ("plaintiff") on November 8, 1995, to perform electrical work on the island. The work involved replacing high-voltage safety equipment and re-coordinating the electrical mapping of the island in response to the various additions and changes that had taken place since the last coordination. The contract, as modified, ultimately contemplated a two-hundred-day project for a fixed price of $240,118.72, and bidders were obliged to visit the island to see the local conditions before bidding on the contract. Plaintiff failed to do so—at its peril—and received the contract; therefore, upon defendant's summary judgment motion, plaintiff lost its differing site conditions claim insofar as it was based on anything that would have been discoverable on the site inspection. *See Orlosky Inc. v. United States,* 64 Fed.Cl. 63 (2005) (order granting in part and denying in part motion for summary judgment).

Plaintiff proceeded to try claims for delay, breach of warranty of specifications, and breach of the covenant of good faith and fair dealing, for which plaintiff sought recovery in the amount of $565,481.00. Trial succeeded in diverting the focus away from plaintiff's pre-bid failures to the Navy's mistreatment of a small contractor mired in a difficult situation. The acts that plaintiff proved at trial, with assistance due to the illuminating candor demonstrated by certain defense witnesses, strike at the heart of the Navy's duties to deal fairly with its contractor, and the law affords relief for this kind of breach. Plaintiff also recovers on other claims, though not to the extent that it had hoped.

The factual background that follows, and the facts explicated in more detail in the subsequent legal discussion, constitute findings of fact based on this court's consideration of all documentary evidence and its assessments of each fact and expert wit-

nesses.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Orlosky Inc. is a corporation organized under the laws of Nevada. It was created by Joseph R. Orlosky and his colleagues in or around late 1994 for the purpose of obtaining military construction contracts from the United States Navy.

San Nicolas Island is one of the California Channel Islands off the coast of Point Mugu. It is part of the U.S. Naval Weapons Center at Point Mugu, used for missile tests and warfare training because of its isolated environment and shoreline characteristics. The island has a high-voltage electrical system, including a grid of high-voltage power lines, supplying power to the various structures. The addition of new buildings requires modification of the electrical system because each structure receives electricity from what is referred to as a single-line system. As changes are made to the power use, the overall electrical system must be modified to keep pace with the actual use. These upgrades included the completion of a "coordination study," which Mr. Orlosky described as "a study of a system that could consist of more than one leg of a ... high voltage network whereby the study would reveal the loads at different points throughout the system and certain curves of surge throughout the system." Transcript of Proceedings, *Orlosky Inc. v. United States*, No. 01–634C, at 18 (Fed. Cl. June 13–17, 2005) ("Tr.").

Because San Nicolas Island required a new coordination study, the Navy issued Solicitation No. N62474–95–B–4778 on July 7, 1995, for that purpose. The solicitation also required the contractor to replace several, but not all, of a certain type of electrical equipment used on the island called reclosers. Reclosers operate essentially as high-voltage circuit breakers, responding automatically to surges or other electrical problems by shutting off the electricity. As explained by Mr. Orlosky,

> It opens and closes and to shut off. [L]et's say you have a short circuit, someone runs into a telephone pole or runs into a transformer and shorts out the transformer down stream the micro-processor will surge the increase in amperage. It will send a signal to disconnect the recloser for a moment and then it kicks it back on to see of there's another surge and it will do this many times depending on how you program it.

Tr. at 170–71. The equipment includes a cooling tank filled with oil, a microprocessor, insulator pins jutting out from the top for the incoming and outgoing voltage, and, among other internal parts, a transformer. Power comes in from the generator through the transformer into the recloser. While the reclosers to be replaced did not have a microprocessor, the new version did.

The solicitation made available to bidders the specifications and various plans and drawings for use in preparation of the bids. It also provided bidders with an opportunity to conduct a pre-bid site visit to San Nicolas Island, which was scheduled for July 26, 1995. Six bidders attended the site visit, but plaintiff was not one of them.[2]

---

1. Although the court considered the testimony of every witness, discussion of each one is not necessary to render this opinion. Plaintiff presented the following fact witnesses: Joseph P. Orlosky, plaintiff's president and chief fact witness; Joe E. Perry, Jr., an employee of plaintiff during the relevant time period; Medford Leon (M.L.) Smith ("Smitty"), Contract Manager for the U.S. Naval Weapons Center on San Nicolas Island; Frederick A. Dallmer, Defense Contract Audit Agency ("DCAA") supervisory auditor during the relevant time period; and Jerrel G. John, CPA, plaintiff's accountant, who assisted plaintiff with the submission of its Request for Equitable Adjustment (the "REA"). Plaintiff's expert witness in delay analysis was A. Alan Cade.

Plaintiff's rebuttal case included expert witness in electrical engineering Harry A. MacDonald, California licensed electrical engineer, and Messrs. Cade and Orlosky.

Defendant called as fact witnesses: Michael T. Douglas, U.S. Naval Weapons Center's Engineering Technician and Resident Officer in Charge of Construction (the "ROICC") on St. Nicolas Island; Paul Stone, DCAA auditor; and Mark H. Gabrilska, Operations and Maintenance Supervisor for Public Works, U.S. Naval Weapons Center on San Nicolas Island. Defendant recalled Messrs. Cade, Smith, and Orlosky. Defendant's expert witnesses were Robert A. Simpson, expert in electrical systems; and Richard C. Paullin, expert in scheduling and delay analysis.

2. Mr. Orlosky testified that he did not attend the site inspection for the following reason:

Bidding opened on August 8, 1995, and plaintiff and six others submitted bids. Although plaintiff's bid of $240,118.11 was not the lowest, the Navy rejected the lower bidders and awarded the contract to plaintiff on November 8, 1995, for its full bid amount. A letter of that date informed plaintiff of its award and directed plaintiff to proceed under the contract. The Navy required a performance bond in the amount of the bid and a payment bond for half that amount. The contract completion date was set for March 25, 1996—a date that incorporated an eighty-day extension to the original project duration under an amendment to the solicitation executed July 26, 1995. Shortly after award, the completion date again was extended to June 11, 1996.

The contract required plaintiff to prepare a construction schedule within fifteen days of award and an equipment delivery schedule within twenty-one days of award. Contract § 01010, ¶¶ 1.20.2.1 & .2. The original schedule plaintiff submitted, stated that plaintiff would finish the job by March 25, 1996.

Plaintiff also had to submit a quality control plan within thirty days after receipt of the notice of award. Because of the location of the work, the Navy provided plaintiff with transportation to and from the island, both for plaintiff's personnel and for its equipment. The equipment had to be barged out to the island, and personnel were transported in passenger aircraft. Plaintiff was responsible for arranging the transport of its equipment, following the Navy's barge schedules.

The contract had two distinct aspects. The first was to replace several of the reclosers as indicated by the contract drawings. The second was to complete the coordination study of the electrical system. Before proceeding with the work, the parties held a pre-construction conference on December 4,

1995. The meeting did not occur on site; it was held at the Resident Officer in Charge of Construction's (the "ROICC") office in Point Mugu, California. At this meeting plaintiff learned of what it believed to be a significant defect in the contract plans and specifications regarding the reclosers. This issue was one of several difficulties that the contractor encountered during the planned contract performance period.

The recloser issue implicates what Mr. Orlosky and other witnesses for plaintiff characterized as misrepresentations in the specifications. According to Mr. Orlosky, the specifications depict the existing conditions on the island as making use of pole-mounted reclosers. In fact, he was told at the December 4 meeting that the reclosers were not actually mounted on poles. Although he testified that the reclosers were the type intended to be installed on poles, the reclosers were installed inside small buildings. Some reclosers were mounted on pads, close to the ground, while others were mounted on stanchions.[3] Plaintiff's expert in electrical engineering, Harry A. MacDonald, cited to section 16370 of the contract, entitled "Overhead Electrical Work," which, because reclosers were described within that section, led him to conclude that the contract "could only be interpreted to be an overhead recloser." Tr. at 1357. Mr. Orlosky testified that "the specifications require that we install the reclosers and transformer, microprocessor using the large washers in the spec mounted to wooden poles." Tr. at 28.

Mr. Orlosky testified that, commonly, installation of pole-mounted reclosers is performed on the outside with the use of an overhead crane. Because reclosers contain glass tubes internally, cautious handling was required or the equipment would break.

It was a very, very easy job. Very straight forward, very ordinary and common procedure where the plans specifically show pole mounted reclosers. The specs specifically require pole mounted recloser [sic] to be installed and the method, and therefor[e] I saw absolutely no reason to go to the island. And the risk I assumed was if I had a telephone pole on the side of a hill to put a recloser on that was my risk. I'd have to install that and do the earth work and whatever to get it up on that pole.

That was the only risk that we assumed when we did the project.
Tr. at 51.

3. When asked whether there was a difference between a stanchion and a pole, Mr. Orlosky stated they were "similar," but, "[w]ell, technically they're just like—it's verbal. One's on a pole one's on a [stanchion.]" Tr. at 31.

Under the belief that installing overhead-type reclosers into small buildings would violate safety regulations and the manufacturer's warranty, Mr. Orlosky asked the Navy at the December 4 meeting if it wanted plaintiff to proceed as planned or to modify the procedure of installation. According to Mr. Orlosky, "So, they said yeah that's probably what they want to do and they said they would get back with us." Tr. at 63–64.

At that same meeting, Mr. Orlosky also asked to be provided with all the contract drawings required, including what was known as "Dapper data." The Dapper data, as Mr. Orlosky explained, show the existing conditions on the island by computer printout. Mr. Orlosky's position was that the Dapper data should have been provided immediately upon award, but contract section 16313, paragraph 1.3.3.1(b) states: "The Government has existing data files for the commercial product 'Dapper' by SKM Systems Analysis Inc. These files are available." Nevertheless, Mr. Orlosky insisted the data were necessary to create the coordination study.

On February 22, 1996, just over one month before the contract was scheduled to be completed, Mr. Orlosky wrote two letters to Philip Benoit, Project Engineer and ROICC. The subject of the first letter included the topic "delays in commencement," and Mr. Orlosky detailed extensively the problems related to the reclosers. He also complained about the Navy's failure to respond to plaintiff's numerous requests for direction concerning the type of reclosers needed. In his second letter, regarding the subject of "coordination study materials under government control," Mr. Orlosky wrote regarding the Navy's failure to deliver the Dapper data that "[t]hese materials were promised to us at the December 4, 1995 meeting and I have verbally requested the data on several occasions since that date, but to no avail."

Mr. Orlosky wrote to Medford Leon (M.L.) Smith ("Smitty"), Contract Manager, on March 4, 1996, regarding the reclosers. Mr. Orlosky advised that "urgent response [was] required" and that plaintiff "had not placed the order for those reclosers specified under contract" because it had not heard from the Navy on the matter yet. Mr. Smith responded to Mr. Orlosky by letter dated March 5, 1996, stating that "[t]he requirements for the materials in this contract have not changed." Contract Manager Smith also wrote that the Dapper data disks were mailed on that day. Mr. Orlosky's letter, dated March 12, 1996, explained that

the reason why [he] wanted a written answer to the Government[']s decision, as to the selection of the reclosers, was because of the concerns express[ed] by Government representatives, during our December 4, 1995 pre-con meeting, that the Government may have made a mistake in specifying overhead type reclosers rather than pad mounted type.

Mr. Orlosky noted in this letter that he had ordered the reclosers.

By March 1996 plaintiff also had begun experiencing difficulty with obtaining outages to allow its work under the contract, much of which could be only undertaken during a power outage. Recognizing this need, the contract established a procedure by which the outages could be obtained. On February 27, 1996, Mr. Orlosky wrote to Mr. Benoit requesting the first of several outage requests. He completed a standard form, entitled Facility Services Request ("FSR"), which described plaintiff's request for an outage, but did not indicate a date.

The Navy did not approve plaintiff's outage requests. Instead, Contract Manager Smith told plaintiff that it needed to use a different standard form called a Utility Outage and Digging Permit Request to request an outage. Plaintiff resubmitted its outage requests by form dated April 2, 1996. Mr. Orlosky testified that the use of one particular form or another was not a contract requirement and created a growing source of frustration for him.

In addition to delays in providing plaintiff with the Dapper data and responding to the recloser issues, plaintiff encountered more problems when Mr. Orlosky and his personnel went to the Island on April 1, 1996. For example, plaintiff was prohibited from accessing locked cabinets. According to Mr. Orlosky, Mark H. Gabrilska, the Public

Works Operations and Maintenance Supervisor, "said that he had refused to give me the key even if they told him to give me the key." Tr. at 116. Mr. Orlosky documented these problems in a letter, dated April 3, 1996, to Contract Manager Smith. He also related that a Public Works employee disconnected the power running to plaintiff's on-site office.

Mr. Orlosky recounted at trial his instructions:

Yes, this is what they told me I had to work out at-Public Works was telling me that we had to get this lady Vivian, whoever she is, and they gave me Mark the supervisor of Public Works gave me the phone number and said, give it to Smitty he's got to work out some kind of charge code with Vivian, otherwise it couldn't help me.

Tr. at 112. He also testified that no one ever informed him of this requirement. It is not in the contract.

Plaintiff thus was required to submit additional requests for the presence and approval of Public Works personnel. One such request, dated April 3, 1996, sought Public Works personnel "A.S.A.P." so plaintiff could have access to locked high-voltage cabinets, without which plaintiff could not complete the coordination study.

As confirmed by testimony of Navy personnel, the Navy's refusal to permit plaintiff access to the work site prompted Mr. Orlosky to write Contract Manager Smith, by letter dated April 18, 1996, that plaintiff could not find any "reference, in the contract documents, where there exist[s] a requirement, or any other obligation on the contrac-. tor[']s part, to present an outage request, or any other form or document to the ROICC, for daily access to the work area," with one minor exception.

While plaintiff struggled to get access to the site, the Navy sent a certified letter to plaintiff on May 2, 1996, stating that plaintiff "[t]o date ... ha[s] not put in place any of the work" despite "that approximately 80% of the contract time ha[s] elapsed." Plaintiff responded with a three-page, single-space letter dated May 9, 1996, wherein Mr. Orlosky outlined the various difficulties and de-

lays that had occurred. Mr. Orlosky also requested an eighty-five day extension and costs associated with a delay related to the reclosers.

Mr. Orlosky explained in his May 9 letter that plaintiff had discovered defects within the Dapper data—receipt of which had been delayed—and in the drawings. He attributed to these problems the subsequent halt in progress on the coordination study because the drawings and data had to be reworked. He requested a twenty-day extension to complete the coordination study and costs for correcting the data and redrafting the drawings. As the Navy had requested plaintiff to explain how it was going to accomplish the contract, Mr. Orlosky advised that

the actual work to change all of the fuses and remove and replace the 6 reclosers and adjust one, with final testing and inspection, can be completed in about 15 working days, providing that access is not a problem. We intend to commence replacing fuses as soon as the coordination study is approved.

Contract Manager Smith responded with a letter on May 13, 1996, wherein he explained that the Navy "disagree[s] with your contention that the Government has delayed you. Public Works' failure to help you does not constitute a government delay, since it has no contractual authority on the subject contract."

Plaintiff completed the physical work on replacing reclosers and conducting the coordination study in June through August 1996. The Navy conditionally approved the coordination study on June 17, 1996, subject to an update to section 4.0 of the study and receipt of experience per contract section 16313, paragraph 1.3.3.1e. That section required that "[w]ork shall be performed by an electrical engineer registered in the State of California with at least 10 years of experience in the performance of coordination studies."

Plaintiff thereafter continued to experience difficulty with recloser installations, outage requests, as well as other work on the site, which generated much correspondence over the summer of 1996. Plaintiff also continued to seek modification to the contract for re-

drafting of drawings and correcting Dapper data. On June 26, 1996, Mr. Orlosky requested such a modification by letter to Contract Manager Smith, wherein he "urge[d] the Government to modify [the] contract" because "the contract supplied drawings have so many discrepancies that the drawings are unusable to base a coordination study [on.]" Mr. Orlosky explained that plaintiff had "already completed 80% of the effort for the new drawings and the remaining work to complete the work would not cost more than $1,000." The Navy issued a proposed change order to the contract, dated July 26, 1996.

By late August 1996, a new dispute surfaced over the testing of the reclosers that had been installed, but not tested pursuant to contract. Mr. Orlosky showed up for a planned "trip test" of the reclosers. However, Mr. Gabrilska, Operations and Maintenance Supervisor for Navy Public Works, with ROICC Douglas acting as his messenger, called off these tests. While he did not inform Mr. Orlosky of the reason, Mr. Gabrilska apparently was concerned the brief power outages caused by the trip tests would interfere with upcoming foreign-government operations on the island. Specifically, Contract Manager Smith testified that the Navy was unable to grant power outages between approximately June and August 1996 because the island was being used for a project by the Government of Japan. On August 27, 1996, Mr. Orlosky wrote to Contract Manager Smith asking for information about how to proceed with the testing. He also informed the Navy that plaintiff was unable to complete its work because of this and other issues and that plaintiff "elected not to demobilize [its] equipment at this time until the Government has had the opportunity to respond to this request for information."

On September 25, 1996, Mr. Orlosky wrote to Contract Manager Smith regarding the proposed change order. After seeking $15,000.00 for the proposed work—which included recreating drawings and Dapper data—plaintiff also requested $85,000.00 "for past, present and future delays and disruptions[.]" Mr. Smith responded on September 27, 1996, stating that the proposal was in improper form and must be resubmitted; he

also asked plaintiff to explain "the reasons you feel the Government is solely responsible or concurrently responsible for any and all delays."

On December 4, 1996, the Navy wrote to plaintiff acknowledging receipt of the statement giving the experience of the coordination engineer, but advising that it had not received an updated section 4.0—both were required for the approval of the coordination study. Despite his belief that the study was already approved, Mr. Orlosky submitted a revised coordination study as an enclosure to a February 4, 1997 letter. Thereafter, Contract Manager Smith informed plaintiff that the Navy was terminating the contract for convenience. Plaintiff confirmed that conversation by letter dated February 11, 1997, which included a shipping document to schedule removal of plaintiff's equipment from the site. Apparently crossing in the mail, was a letter from E.W. Ruckle, then ROICC, to plaintiff on February 11, 1997, declaring the contract "usably complete" with an effective date of August 25, 1996.

On July 7, 1997, plaintiff submitted a request for equitable adjustment. This submission marks the beginning of a four-and-one-half-year period of negotiations between the parties, including two audits, that ultimately led to the filing of plaintiff's complaint in November 2001. Defense Contract Audit Agency ("DCAA") audits were performed in 1997 and again in 2000. During this period the Navy led plaintiff through an obstacle course of claim verification and proposal resubmissions. This period of time is the predicate for plaintiff's claim based on bad-faith dealings, and the discussion of that claim will explore in detail what occurred.

### PROCEDURAL HISTORY

Plaintiff filed its complaint on November 9, 2001. Defendant answered on February 12, 2002. After lengthy discovery, defendant moved for partial summary judgment on March 12, 2004. Plaintiff cross-moved on April 16, 2004. The cross-motions for summary judgment were fully briefed by June 1, 2004. The assigned judge did not issue a ruling, and the case was transferred to the

undersigned by order dated December 9, 2004.

The court held oral argument on the parties' cross motions for summary judgment on January 14, 2005. On February 2, 2005, the court issued an opinion and order, entering partial judgment in defendant's favor. *See Orlosky*, 64 Fed.Cl. 63. Judgment was granted in defendant's favor insofar as plaintiff's claims for differing site conditions and breach of warranty of specifications were related to any conditions discoverable on the site inspection that took place without plaintiff's participation. The remaining issues were tried.

At the close of plaintiff's case in chief, defendant orally moved under RCFC 52(c) for judgment on the following partial findings: (1) Plaintiff could not recover any claim for costs incurred between November 8, 1995, and March 11, 1996; (2) plaintiff could not recover costs arising from any unplanned installation procedures for fitting in the new reclosers into the spaces that existed on the island; (3) plaintiff could not recover claims for breach of warranty of specifications relating to safety issues in connection with requiring plaintiff to install overhead-mounted reclosers in a pad-mounted condition; (4) plaintiff could not recover profit on work that falls within the Suspension of Work clause; (5) plaintiff could not recover damages for breach of the implied duty of good faith and fair dealing that are not specifically connected to a particular harm; (6) plaintiff could not recover consulting and accounting costs incurred during claim preparation; (7) plaintiff could not recover consequential damages dealing with lost business opportunities and the destruction or insolvency of the business; and (8) plaintiff could not recover *Eichleay* damages for the period of time beginning after plaintiff completed installation of the reclosers.

Plaintiff withdrew its claim with respect to the first ground of defendant's motion, and defendant withdrew its motion with respect to its second ground. The court granted defendant's motion, in part, as follows, with respect to the following grounds numbered in parentheticals: (3) granted insofar as plain-

tiff had a failure of proof based on violations of any manufacturer's warranty, but denied insofar as the Government may have breached a duty by requiring plaintiff to install not according to applicable safety regulations; (4) denied; (5) granted; (6) granted; (7) granted; and (8) denied.

## DISCUSSION

"This contract was not perfectly written or administered[,]" announced defendant in its pretrial papers. Def.'s Br. filed Apr. 12, 2005, at 1. The evidence certainly bore that out, but not insofar as plaintiff seeks compensation in the amount claimed. Plaintiff proceeded to trial with a narrower version of its case compared to its complaint. Plaintiff's six-count complaint attempted to ground liability on the following theories: (1) breach of contract; (2) differing site conditions; (3) breach of implied warranty; (4) delays; and (5) breach of the covenant of good faith and fair dealing.

The success of defendant's motion for summary judgment precluded plaintiff from recovering damages for that which it would have learned had it attended the site inspection. Defendant prevailed with respect to plaintiff's differing site conditions claim and its breach of warranty of specifications claim insofar as the latter equated to and thereby collapsed into plaintiff's differing site claim. *See Orlosky*, 64 Fed.Cl. at 69–70.

What could not be resolved on a motion for summary judgment included allegations that the Navy directed plaintiff to install electrical equipment in violation of the manufacturer's warranty, which plaintiff argued would constitute a breach of the warranty of specifications. That is the claim to which the court first turns.

### I. Breach of contract claims

Mr. Orlosky testified for two full days, was on the witness stand intermittently over two more, and served as plaintiff's rebuttal witness on the fifth. His testimony was often self-serving and imprecise. No grievance escaped his pen, although the Navy certainly subjected plaintiff to more than any contractor's fair share. For their part the Navy

witnesses were marginal, at best. At one point the court was constrained to advise defense counsel that the Navy's (now fortuitously retired) Contact Manager, Mr. Smith, was showing himself insufficiently coherent to be allowed to continue to testify. The court could not credit Mr. Smith with being other than derelict in contract coordination duties.[4] Mr. Gabrilska, Operations and Maintenance Supervisor for Navy Public Works on island, confirmed that the Navy ignored plaintiff's plight in obtaining power outages. Indeed, Mr. Gabrilska was totally unaware of the work that plaintiff had been engaged to perform. Michael T. Douglas, an engineering technician at the ROICC's office on San Nicolas Island, testified that plaintiff could have performed the post-installation test in one hour, but was put off for weeks either due to the ROICC's inability to coordinate with Public Works or the *force majeure* of the need to accommodate the exercise that was being carried out by the Government of Japan. In any event, because the reclosers ultimately were installed within a three-day period and the testing should have taken one hour, plaintiff's idyl on San Nicolas Island was not prolonged due to its own actions.

1. *Breach of the implied warranty of specifications: installation of the reclosers*

▮ Plaintiff charged that the Navy misidentified the existing reclosers on the island and specified a type and installation procedure for the new reclosers such that the Government breached its implied warranty of the fitness of specifications. Although plaintiff could not prevail on its claims insofar as it could have identified the type of reclosers then installed on island via a site visit, plaintiff pressed what it contends are additional claims related to breach of warranty. However, insofar as plaintiff's case in chief sought to prove a claim that the Navy required plaintiff to install the reclosers in a manner that violated the manufacturer's warranty, as noted above, the grant of defendant's Rule 52(c) motion precluded recovery on that basis. The balance of plaintiff's evidence only confirmed that finding.

Plaintiff also sought to prove a breach of warranty of specifications based on the Navy's requiring plaintiff to install the reclosers pursuant to specifications. Mr. Orlosky's letter of February 22, 1996 to Mr. Benoit explains that the reclosers that existed on the island before plaintiff completed any work were overhead reclosers placed in small buildings. He manifested concerns about purchasing new overhead reclosers and mounting them in the manner similar to how the previous reclosers were mounted. He raised concerns about performance of the reclosers, as well as about safety issues. Mr. Orlosky testified that he continues to believe that the current installation of the reclosers on San Nicolas Island is a "deadly, dangerous situation and should be corrected immediately." Tr. at 170.

Mr. MacDonald, the expert in electrical engineering, testified that he "cringes" when looking at photographs of the installation, because "they do not comport to reasonable safety even for qualified individuals, much less for unqualified individuals that may stumble into [the structures housing the reclosers] quite pointedly." Tr. at 1363. Mr. MacDonald commented extensively about various safety concerns related to the reclosers. He described the drawings and specifications as poorly coordinated, "contradictory," Tr. 1361–62, "vague," and "ambiguous," Tr. at 1356. He concluded that the specifications were not "suitable for the purpose intended." Tr. 1362. The drawings and specifications did not indicate that the reclosers were installed inside small structures, Tr. at 1362, and the specification "could only be interpreted to be an overhead recloser," Tr. 1357. However, he conceded that if one visited the site and observed the type of recloser mounted in enclosures, "[w]hen you see the installation as it exists, obviously you see that there are constraints that are not carried forth in the construction documents."

Plaintiff cannot overcome the decision on summary judgment on any claims related to recloser installation where a site inspection, along with a review of the drawings and

4. To use the characterization put forward by plaintiff's counsel, "Smitty['s name] ... [is] one

consonant off [the word] that describes the job he did." Tr. at 1452.

specifications, would have shown that plaintiff had to install pole-mounted reclosers in the small structures. In other words, had plaintiff attended the site inspection, it would have discovered that the reclosers were in small buildings, which would have, according to plaintiff's own expert witness, alerted plaintiff to all the problems that it discovered only after it began to work. Because plaintiff cannot circumvent the prior finding that a site inspection would have disclosed the problems that it encountered within the reclosures, plaintiff cannot recover for extra work or costs associated with any safety violations encountered on the island.

2. *Breach of express term: Dapper data*

■ Plaintiff sought to prove that the Navy caused compensable delays by failing timely to provide the Dapper data, which, according to plaintiff, were required for the completion of a coordination study. Plaintiff also charged that the Dapper data that it received eventually turned out to be defective, requiring plaintiff to redo the data as out-of-scope work.

Plaintiff points to section 16313, paragraph 1.3.3.1 of the contract, entitled "Protective Device Coordination." Subparagraph (b) provides, in part, that "[t]he Government has existing data files for the commercial product 'Dapper' by SKM Systems Analysis Inc. These files are available." Mr. Orlosky did not receive the Dapper data at the start of the contract. A February 22, 1996 letter from Mr. Orlosky to the ROICC, Mr. Benoit, authored months into the contract, stated that the Dapper data "w[as] promised to us at the December 4, 1995 meeting and I have verbally requested the data on several occasions since that date, but to no avail." Plaintiff did not receive the Dapper data, Mr. Orlosky recalled, until March 11 or 12, 1996; the Navy sent the data disks via certified mail on March 5, 1996.

Despite the delay, plaintiff withdrew its claim for delay costs incurred from November 8, 1995 through March 11, 1996. Although plaintiff does not seek recovery of costs associated with that delay, it does contend that, without the Dapper data, plaintiff could not begin the coordination study, and it seeks compensation for the delay in completing the coordination study that was caused by the delay in receipt of the Dapper data. In addition, plaintiff claims the costs incurred when it recreated the Dapper data because the disks proved to be defective.

With regard to the first claim, plaintiff failed to prove that the coordination study could not begin or was in any way dependent, per specification, on the availability and reliability of the Dapper data. Mr. Orlosky testified that the Dapper data provides electrical data of the existing conditions on the island. Plaintiff "needed that because the drawings specifically only circled certain areas to be coordinated so you use the dapper captor data ... in order to make the amendments to those areas that they have changed." Tr. at 71.

When plaintiff finally received the Dapper data, it was discovered—according to Mr. Orlosky—by plaintiff's subcontractor that the data were defective inasmuch as they failed to identify the current conditions on the island. As Mr. Orlosky testified:

For the specifics you would have to talk to Power Systems [Testing Co.] but, it missed so much of the information on the current conditions of the Island that it was impossible for us to comply with the contract documents and pick certain or coordinate certain specific transformers that they had marked to coordinate when the data [were] defective.

Tr. at 121. He explained in more detail that

[plaintiff had] to go through and recreate and fix the data otherwise the fuse mount that we would be giving that number would be incorrect and it would blow out or it could cause a fire by giving too much amperage to the line .... The single line did not show all the fusing in all the buildings and the dapper data [were] useless. We had to recreate it all.

Tr. at 141.

While the Dapper data may have been defective—plaintiff did not offer testimony or other evidence from the subcontractor that actually discovered the defects—Mr. Orlosky viewed the Dapper data as only one

problem that required plaintiff to complete out-of-scope work:

> The dapper data came in it was discovered that the dapper data [were] inconsistent with the drawings and that the drawings [were] inconsistent with the existing [site] conditions on the Island so, it was all both of the drawings and the dapper data [were] then useless to coordinate[ ] one item in the middle of an single line. You had to recreate the proper single line showing all of the fuses and then you had to recreate the dapper data to show the load so that when you go to the one that's marked to coordinate you can properly coordinate the system[.]

Tr. at 121–22.

Apart from Mr. Orlosky's opinions, plaintiff offered no expert testimony to substantiate the connection between Dapper data and the coordination study. Mr. Orlosky admitted that he did not have the "specifics," Tr. at 121, and as for the contract, plaintiff only pointed to section 16313, paragraph 1.3.3.1, which is entitled "Protective Device Coordination." Subparagraph (b) provides, in part, that "[t]he Government has existing data files for the commercial product 'Dapper' by SKM Systems Analysis Inc. These files are available." The fact that the contract required the Navy to make "available" certain data does not establish that such data were critical to anything.

Mr. Orlosky claimed that the ROICC acknowledged the need to recreate Dapper data and, in fact, told plaintiff that the Navy would pay for the costs. Thus, although plaintiff had its subcontractor recreate the data using the findings that plaintiff made on site, plaintiff did not offer any evidence to substantiate such an authorization, other than Mr. Orlosky's own recollection. Mr. Orlosky referred to a Request for Information, dated June 26, 1996, which attached a letter from him of the same date.

Mr. Orlosky's letter stated that "[w]ith regards to other data, the Government would also save time and money if we were ordered to complete the Dapper and Captor data, on diskette, for all of the islands Coordinated Electrical Distribution System .... As I indicated to you some time ago, we could not use the dapper data that was sent to us[.]" He testified that Mr. Smith and Contracting Officer Joe Ann Carrignan, both said that the Navy would pay for the Dapper data to be recreated, but that plaintiff was never paid for it. Tr. at 180. Defendant has conceded this claim.

PX 148 is a Navy document with an illegible date in 1996. It lists what are explicitly defined as "proposed" changes, including a proposed change to provide Dapper data. It asks for plaintiff to submit a cost proposal. Mr. Orlosky was adamant that not only had the Navy already ordered plaintiff to recreate Dapper data, but that the Navy already had in hand the new Dapper data. Despite the statement in PX 148 that "[t]his request *does not constitute direction or authorization* to proceed with the proposed changes[,]" Mr. Orlosky maintained that "[t]hey gave me authorization to proceed with this and ordered me to do it other wise [*sic*] we couldn't complete the coordination study." Tr. at 202.

Such statements are insufficient to meet plaintiff's burden of proof that the Navy ordered extra or different work. The court finds Mr. Orlosky's testimony on this point to be totally unsubstantiated, and, in fact, contradicted by documentary evidence. That Mr. Orlosky paid its subcontractor, Power Systems Testing Co., for the "extra data" is beside the point. Tr. at 444.[5]

The court does note that plaintiff put forth evidence to prove that the Navy did receive new Dapper data diskettes. Mr. Orlosky wrote a letter on September 25, 1996, addressed to Contract Manager Smith, wherein he discussed the "extra work" related to the

---

5. Power Systems Testing Co. billed plaintiff for "additional expenses" that included reconstructing drawings and recreating data in a total amount of $6,500.00. The invoice is dated July 7, 1997. Mr. Orlosky testified that that amount was not plaintiff's expense related to Dapper data, just the invoice for its subcontractor. Tr. at 465.

Plaintiff incurred costs gathering field data to recreate the Dapper data, but it was required because of defects in the contract drawings. As discussed above, plaintiff is charged with notice of such defects because of what would have been apparent from a site inspection.

Dapper data. Contract Manager Smith responded with a September 27, 1996, letter, asking for a proposal and more detail on the subject. A letter dated October 4, 1996 from Mr. Orlosky to Contract Manager Smith states that the Dapper data were attached to it.

Nonetheless, plaintiff did not prove that it was required to submit new Dapper data, either by the nature of the effort actually required to perform the coordination study or by order from the ROICC. The parties stipulated that "[plaintiff] never asked the Navy any pre-bid questions about Dapper data." Parties' Stipulation to Facts ("Stip."), filed Apr. 28, 2004, ¶ 29. Another stipulation states that "[plaintiff] never attempted to inspect the Dapper data prior to bid." Stip. ¶ 33. Mr. Orlosky testified that he "assumed" the data would be accurate and that any problems with the data would cause an increase in the coordination study costs. Tr. at 676–77. If Dapper data had been vital to the coordination study, surely plaintiff at least would have inquired about the Dapper data prior to bidding.

### 3. *Breach of express term: coordination study*

While plaintiff charged that defective Dapper data and the delay in providing it related to costs associated with completion of the coordination study, plaintiff complains of other Navy-caused delays and cost overruns concerning the coordination study. First, plaintiff seeks to show that the Navy breached its contract by failing timely to approve the coordination study. Second, plaintiff charges that although power outages were necessary for it to complete the coordination study, the Navy refused to respond timely to such requests in breach of contract. Finally, plaintiff contends that the Navy required plaintiff to complete a second coordination study, and it seeks the costs incurred for doing such out-of-scope work.

#### 1) *Failure to timely approve the coordination study*

■ A. Alan Cade, plaintiff's expert in delay analysis, created a summary exhibit that illustrated plaintiff's as-planned sched-

ule. This schedule shows that plaintiff planned on submitting the coordination study for approval by December 8, 1995. The Navy was to approve it by December 31, 1995. A separate summary chart also depicts what actually occurred.

Plaintiff did not submit the coordination study until May 20, 1996. The Navy conditionally approved it, subject to two requirements: Plaintiff was required to submit (1) proof of experience per section 16313, paragraph 1.3.3.1(e); and (2) an updated section 4.0. The first condition signified that plaintiff must forward to the ROICC the experience certifications of Power Systems, the subcontractor that prepared the coordination study. The second condition required a technical update to the time current curves in the study. This conditional approval was dated June 13, 1996.

Plaintiff introduced a letter, dated December 12, 1996, from Mr. Orlosky to Contract Manager Smith, which stated that "it is this contractors [*sic*] opinion that the Government has accepted and approved the coordination study on June 13, 1996[.]" However, the evidence establishes that plaintiff failed to comply with the conditions required by the June 13 conditional approval until after plaintiff's December 12 letter. Contract Manager Smith responded to Mr. Orlosky with a letter, dated January 28, 1997, stating that the conditions had not yet been met. Mr. Orlosky then sent Contract Manager Smith a letter, reaffirming plaintiff's contention that the coordination study was approved, but advising: "Notwithstanding the above, enclosed is a revised coordination study[.]"

While Mr. Orlosky recalled that plaintiff complied with both conditions immediately, the evidence is to the contrary. First, no documents complement his memory. Second, and more importantly, the coordination study submitted to the Navy bears a date of February 10, 1997, as a received date, and reads "Revision 1 January." Third, the usably complete letter from the Navy is dated February 11, 1997, which, of course, implies that the Navy was waiting for the revised section 4. That the February 11 letter designated the usably complete effective date as August 25, 1996, implicates a different issue.

The Navy is therefore not liable for delays in the approval of the coordination study.

### 2) *Delay to completion of the study due to lack of power outages*

■ Prior to plaintiff's submission of the coordination study in May 1996, plaintiff does complain of one period of delay caused by the Navy's failure to allow access. Mr. Cade's chart contains a period labeled "Delay—Access To Prepare Coordination Study" that begins on March 13, 1996, and ends on April 17, 1996, a period of thirty-six days. That access period stems from plaintiff's first request for a power outage, found in a letter from Mr. Orlosky to Mr. Benoit dated February 27, 1996. That letter represents plaintiff's first and second requests for power outages.

Mr. Orlosky testified that Contract Manager Smith returned the outage request form to him, explaining that plaintiff would need to resubmit the outage request on a different form. Without a power outage, plaintiff could not verify the information and complete the coordination study. Mr. Orlosky resubmitted an outage request on April 2, 1996. Plaintiff finally received an outage on April 17, 1996.

Section 01010, paragraph 3.3 of the contract details the procedures for submitting outage requests. It provides:

> The Contractor shall schedule his work so as to cause the least amount of interference with utility service and station operations. Work schedules involving utility and road interruptions are subject to Contracting Officer approval. No utility cutovers are permitted during regular working hours. Anticipated costs shall be included in the bid. Permission to interrupt any utility service or road shall be submitted in writing to the Resident Officer in Charge a minimum of 15 days prior to the desired interruption date. If permission is denied for the time requested, the Resident Officer in Charge of Construction will provide an acceptable time within eight (8) days of the request-

ed interruption date to accomplish the requested cutover.

Because the type of form is not specified in the contract, plaintiff utilized an appropriate procedure when requesting its first and second power outages. Plaintiff submitted a written request on February 27, 1996, using a Navy form entitled "Facility Services Request." While this form did not contain a date, it specified that "work can be completed on a weekend." The ROICC certainly could have understood that plaintiff was requesting a weekend date in the immediate future.

Although plaintiff did not identify the first weekend after February 27, 1996, the earliest possible date on which the power outage could have been granted was fifteen days after February 27, or March 13.[6] Had the Navy denied the request, it could have rescheduled the outage up to eight days later, which would equate to a total of twenty-three days after plaintiff submitted its first outage request, or March 21. Mr. Cade's analysis, used a fifteen-day period, *see, e.g.,* Tr. at 1042, but did not take into account the additional eight days allotted by the contract. Thus, the period of delay was March 22, 1996, to April 16, 1996, or twenty-six days. The court finds the Navy liable for damages stemming from this delay period.

### 3) *Second coordination study*

■ Plaintiff sought recovery of costs associated with what it contends was out-of-scope work having to do with completing the required coordination study for a second time pursuant to direction from the Navy. There was a failure of proof in this regard. In fact, the evidence demonstrates that plaintiff, on August 27, 1996, listed as "Issue # 5" that: "[I]t is this contractor[']s experienced opinion that the coordination effort should be abandon[ed] and a new coordination effort should be conducted as follows ...." Mr. Smith responded in a September 5, 1996 letter: "Issue # 5, The Coordination Effort: This is not in the contract." This evidence, coupled with the necessary revision submitted in January 1997 discussed above, demonstrates

---

**6.** *While not advanced by either party, the court takes judicial notice of the fact that 1996 was a* leap year. Therefore, February had twenty-nine days, rather than twenty-eight.

that the Navy did not direct plaintiff to create a second coordination study. Plaintiff therefore is not entitled to recover any additional costs-if any had been proved-associated with this claim.

#### 4. *Breach of express term: power outage delays for the installation of reclosers*

■ Mr. Cade's summary also lists two additional delays associated with power-outage requests, both involving the work on the reclosers. Plaintiff alleges these delays were also in violation of section 01010, paragraph 3.3 of the contract, as recited above.

"Request Outage to Install Fuses" reflects a twenty-two-day period from May 23, 1996, to June 13, 1996. A fifty-day delay between July 4, 1996, to August 22, 1996, is attributed to "Request Outage to Install Reclosers."

The first delay claim relating to power outages involves a written request for a power outage dated May 8, 1996. It requests power outage starting May 24 and ending May 27; it also requests the presence of Public Works personnel. Mr. Cade's analysis starts a delay fifteen days after the date of the request, which made the required outage date no later than May 23 for a May 8 request. The activity, and the outages, did not occur until June 14, lasting two days. Thus, plaintiff claims a delay of twenty-two days. Defendant did not dispute the dates that the outages were granted.

However, as discussed above, Mr. Cade's analysis of a fifteen-day period is incorrect. The Navy would have had no fewer than twenty-three days from the date of the outage request. Therefore, the relevant period of delay is May 31, 1996, to June 13, 1996, or fourteen days. The court finds that the Navy caused this period of delay.

The next delay period, according to Mr. Cade, runs from July 4, 1996 to August 22, 1996. This fifty-day delay period relates to an outage request dated June 19, 1996. Although that request seeks a weekend outage from Friday, June 21 through Monday, June 24, Mr. Cade acknowledged the Navy's right under the contract to have more notice. Accordingly, because the Navy did not cause the outage to occur until August 23, 1996, the

relevant period of delay is July 12, 1996, to August 22, 1996, or 42 days. The court finds that the Navy caused this period of delay, as well.

#### 5. *August standby delay*

■ Plaintiff charges that it suffered a fourth period of delay caused by the Navy from August 26, 1996, to March 12, 1997, according to Mr. Cade's summary chart. Plaintiff installed the reclosers over a three-day period, from August 23 to August 25. At that point the contract required plaintiff to test the reclosers. Mr. Orlosky testified, however, that Mr. Douglas, an engineering technician in the ROICC office under Mr. Smith, prevented plaintiff from doing the testing. Mr. Orlosky's letter to Contract Manager Smith, dated August 27, 1996, documents this halt of progress and includes language requesting "written direction" as to when the test should be performed. Mr. Orlosky also wrote:

> [I]n case we do experience a recloser failure during testing we require our construction equipment remain on the Island to remove and replace a recloser if necessary. Therefore, I have elected not to demobilize our equipment at this time until the Government had had the opportunity to respond to this request for information.

Contract Manager Smith responded by letter dated September 5, 1996, directing: "Testing: Perform the test per the contract document."

Defendant put Mr. Douglas on the stand at the commencement of its case. On direct examination Mr. Douglas confirmed Mr. Orlosky's recollection of the events. He explained that he was informed by Mr. Gabrilska that Public Works did not want the trip test because it had "three foreign governments doing operations during this period of time. He didn't want to take a chance that the system might fail and wouldn't be—you know, we wouldn't be able to get the power back up." Tr. at 1118. When asked how long those operations would take, Mr. Douglas stated that "[i]t could have been for weeks." Tr. at 1119.

Plaintiff claims that it was on standby from August 26, 1996 until March 12, 1997, the

date that plaintiff began an eight-day process of demobilization. However, plaintiff received a letter dated February 11, 1997, wherein the Navy declared the project "usably complete on August 25, 1996." Plaintiff acted unreasonably by taking the position that it was still performing the contract after receipt of this letter; the "effective date" preceding the date of the usably complete letter has no legal effect. Thus, plaintiff was on standby only until February 11, 1997. The relevant delay period is thus August 26, 1996, to February 10, 1997. The claimed standby length of 199 days must be reduced by thirty days to a total claimed standby delay of 169 days. The court finds defendant liable for damages stemming from this 169-day standby delay.

### 6. *Breach of the covenant of good faith and fair dealing*

Plaintiff also charges that the some of Navy's conduct during performance of this contract, while not a violation of an express term of the contract, constituted a breach of the Government's implied covenant of good faith and fair dealing. Specifically, plaintiff alleges breaches of the duty to cooperate and the duty not to hinder performance.

■ Every contract includes the implied covenant of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed.Cir.2005); *see also* Restatement (Second) of Contracts § 205 (1981). Two closely related aspects of the covenant of good faith and fair dealing are "the dut[ies] to cooperate and not hinder the contractor's performance." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed.Cir. 1993); *Centex Corp.*, 395 F.3d at 1304 (stating that the covenant of good faith and fair dealing "imposes obligations ... that include the duty not to interfere with the other party's performance"); *see Olympus Corp. v. United States*, 98 F.3d 1314, 1318 (Fed.Cir. 1996) ("[I]nterference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate ...."). A breach of these duties is actually a breach of the covenant of good faith and fair dealing. *See Malone v.*

*United States*, 849 F.2d 1441, 1445 (Fed.Cir. 1988).

The duty not to hinder performance requires a party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.*, 395 F.3d at 1304. The contracting party is prohibited from "doing anything to prevent performance ... by the [contractor] or that will hinder or delay him in its performance." *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977). "Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." *Id.* The specifics of the parties' duties under this covenant are dependent on the particular circumstances of the case. *See Milmark Servs., Inc. v. United States*, 731 F.2d 855, 859 (Fed.Cir.1984).

■ The Government breaches these duties when it acts unreasonably under the circumstances-specifically, if it unreasonably delays the contractor or unreasonably fails to cooperate. *See C. Sanchez & Son*, 6 F.3d at 1542 ("The government must avoid actions that unreasonably cause delay ...."); *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81, 86 (1964) (holding that what actions cause "breach of [the] obligation of reasonable cooperation" depend upon "particular contract, its context, and its surrounding circumstances"). Bad faith on the part of the Government is not required for a breach of these duties, *Abcon Assocs. v. United States*, 49 Fed.Cl. 678, 688 (2001), only "willful[ ] or negligent[ ] interfere[nce] with the contractor in the performance of his contract[.]" *Peter Kiewit Sons' Co. v. United States*, 138 Ct.Cl. 668, 151 F.Supp. 726, 731 (1957). *See generally Tecom, Inc. v. United States*, 66 Fed.Cl. 736 (2005).

The case law is instructive. In *Malone v. United States*, 849 F.2d 1441, 1442 (Fed.Cir. 1988), a contractor built a model home for the military "as a means of establishing workmanship standards before [the contractor] commenced work on other houses." The Government's contracting officer viewed the model home unfavorably, but was evasive in

his answers to the contractor, causing the contractor to complete extensive work not up to the Government's standards. Upon these facts the United States Court of Appeals for the Federal Circuit found a breach of the duty to cooperate on the part of the Government. In *Lewis–Nicholson*, 550 F.2d 26, the United States Court of Claims found that the Government breached its duty not to hinder the contractor's performance when it was unreasonably slow in doing necessary survey and staking work on a piece of land. The Government's failure to do this work in a timely manner hindered the contractor's performance and rendered the Government liable for any damages caused by the delays that the contractor suffered.

### 1) *Access to the work site*

█ Plaintiff contends that the Navy's mishandling of plaintiff's requests for power outages amounted to a breach of defendant's duty to cooperate. For example, plaintiff complained that the contracting officer outright refused plaintiff any access to the island while the Japanese were conducting missile tests.

Mr. Orlosky explained that he was told after he submitted plaintiff's Request for Equitable Adjustment (the "REA") that "the Japanese [were] paying the Government millions of dollars a month or a day or a week or what ever [sic] and to use the Island to test there [sic] missiles and there for [sic] that they couldn't shut the Island down to give me these outages." Tr. at 174. Contract Manager Smith agreed that Mr. Orlosky was uniformed at the time, but testified that he was told later that the reason why the Navy was unable to grant power outages between approximately June and August 1996 was because of use of the island for a project of the Government of Japan. Plaintiff also complained that the Japanese missile testing caused it to incur unreimbursed flight and hotel bills when the Navy cancelled an outage after Mr. Orlosky arrived on site. Contract Manager Smith, however, noted in testimony that those amounts were reimbursed as part of the approximately $18,000.00 modification for "delay and costs." Tr. at 1303.

Plaintiff also complained of the Navy's post-award undisclosed requirement that Navy Public Works personnel had to accompany plaintiff's personnel during work on site. Mr. Orlosky testified that, from the very beginning when plaintiff arrived on site, Navy Public Works would tell Mr. Orlosky that it would not allow plaintiff access to the work area. Mr. Orlosky recounted that he "tried to explain to them that that's what I'm here for, that Smitty allowed us to come over here today .... We had everything with this." Tr. at 106. Access problems extended even to opening locked cabinets:

> We went to the Island and I sent in my request to Smitty to fly over to work on the Island and take the information and do all this and we couldn't even-they-the Government-the Public Utilities Department there wouldn't even allow me to open a locked cabinet to look at the reclosers. I said, you won't even allow me to look at them and he says, no, you have to pay me to open that cabinet door. I said, I don't owe you any money, I scheduled this a long time ago with Smitty, and they said, sorry, if I don't get a charge code, if I don't get money, I don't work.

Tr. at 105. These are just two examples of the difficulties encountered by plaintiff on site. This court finds that the Navy's failure to coordinate with Public Works constitutes a breach of the duty to not hinder performance and to cooperate.

However, a breach of the duty of cooperation, and plaintiff's obvious frustration with it,[7] is not necessarily cause for additional damages. All damages attributable to this failure of the Navy to cooperate are duplicated in plaintiff's claim based on the Navy's failure to comply with the express contract term to provide power outages within eight days of a properly-made request. The Navy

---

7. Regarding the use of different forms for the outage requests, Mr. Orlosky testified:

> I assume they're going to give [the power outage request] to me in the next few days and then I hear from Smitty that, well, you have to fill out another one and I'm thinking there's no way. Why should I have to continue to give you outage requests, you know, I have to have access to the work area.

Tr. at 109.

had an implied duty to cooperate in creating power outages so that plaintiff could perform, just as it had an express duty to provide power outages under the contract. Damages for these actions, therefore, are considered together, below.

## 2) *Reversal of termination for convenience*

■ Plaintiff contends that the Navy breached its implied obligations of good faith and fair dealing under the contract when the Navy reversed its stance that the contract was terminated for convenience. The Navy required plaintiff to submit a request for equitable adjustment (the "REA") that was largely useless. On February 11, 1997, Contract Manager Smith informed Mr. Orlosky that the contract would be terminated for convenience. Jerrel G. John, plaintiff's accountant, testified that, when he prepared plaintiff's original REA dated July 7, 1997, he had meetings with Mr. Smith, from which he "came to believe" that the contract was being terminated for convenience.

However, at the same time, plaintiff received a letter from the Navy declaring the project was "usably complete." When plaintiff requested clarification, none was forthcoming, so plaintiff completed its request for equitable adjustment and submitted it on July 7, 1997. This proposal was largely a waste of time for plaintiff-another hoop through which plaintiff leapt due to the incompetence of the Navy's San Nicolas Island personnel.

Although plaintiff ascribes every delay-causing action of the Navy as conduct breaching implied obligations, in this particular case the court agrees: The Navy's reversal of its termination for convenience violated its obligations of good faith and fair dealing. The Navy should have clarified whether the termination was for convenience or acceptance of the project as usably complete. The Navy, through its negligence, caused plaintiff to incur unnecessary costs in complying with the Navy's request for an REA for a non-

existent termination for convenience; this is a breach of defendant's duty to cooperate. *See Peter Kiewit Sons' Co.,* 151 F.Supp. at 731 (holding that "negligent[ ] interfere[nce] with the contractor in the performance of his contract" is sufficient for liability).[8]

## II. *Damages*

Plaintiff has claimed entitlement to equitable adjustments based upon a variety of changes to the contract, including changed site conditions, breach of the implied warranty of specifications, and extensive delays caused by the Government. However, "[t]o receive an equitable adjustment from the Government, a contractor must show three necessary elements-liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir. 1991).

Plaintiff established liability and causation on four of the alleged delays: twenty-six days for a failure to timely schedule power outage, fourteen days for the same, forty-two days for the same, and one-hundred-sixty-nine days of standby delay for failure to allow plaintiff to complete the testing. These delays constituted breaches of the express and implied terms of the contract.

■ However, breach in itself does not entitle plaintiff to damages; once a breach has been established, "the contractor must still show, as in all contract cases, that damage ensued." *Commerce Int'l Co.,* 338 F.2d at 86; 48 C.F.R. (FAR) § 52.243-7 (2005) (giving equitable adjustment if "Government conduct effected a change ... and the conduct causes an increase .... in the Contractor's cost[s]"). Plaintiff has alleged that the delays caused damages in the form of unallocated overhead costs, as well direct damages, such as extra equipment rental costs, that are not factored into overhead expenses.

## 1. *Eichleay damages for overhead costs*

Plaintiff has shown that it suffered four periods of delay and asserts that it is entitled

8. Other claims for bad faith not specifically addressed herein were considered and found wanting because plaintiff did not claim that it suffered any damages as a result or because Mr. Orlosky was indiscriminate in finding fault with almost everything that the Navy did in the administration of this contract.

to recoup its unabsorbed overhead costs incurred during those periods.

> In the course of performance of any contract, a contractor incurs both direct and indirect costs. Direct costs are those costs that are directly attributable to the performance of a specific contract and can be traced specifically to that contract. Indirect costs include such things as home office overhead, defined as costs "that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract." Generally, a contractor recovers these indirect costs by allocating a proportionate share to each of its contracts. However, when the government causes a delay or suspension of performance, this "decreases the stream of direct costs against which to assess a percentage rate for reimbursement." In such a situation, a portion of the home office overhead is "unabsorbed."

*Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed.Cir.2003) (citations omitted).

Plaintiff invokes the *Eichleay*[9] formula, which "is used to 'equitably determine allocation of unabsorbed overhead to allow fair compensation of a contractor for government delay.'" *Id.* (quoting *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1578 (Fed.Cir. 1994)). Indeed, "the *Eichleay* formula ... is the exclusive formula for calculation of damages for unabsorbed overhead due to government-caused delay in situations in which contract performance has begun." *Id.* at 888.

▇▇▇ However, in order to establish its eligibility for damages under *Eichleay*, plaintiff must first show that (1) a Government-caused delay of inestimable length occurred; (2) the delay increased the original time for performance; and (3) the contractor was on standby and unable to take on other work

during the period of delay. *Id.* at 883; *P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed.Cir.2003).

### 1) Government-caused delay of inestimable length

▇▇▇ "To show entitlement to ... *Eichleay* damages, the contractor must first prove there was a government-caused delay to contract performance ... that was not concurrent with a delay caused by the contractor or some other reason." *P.J. Dick*, 324 F.3d at 1370; *see also Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed.Cir.2000) ("In order to establish a compensable delay, a contractor must separate government-caused delays from its own delays."); *Melka Marine, Inc. v. United States*, 187 F.3d 1370 (Fed.Cir.1999) (holding that Government's failure to obtain permit did not constitute delay where contractor merely performed work out of sequence). Plaintiff successfully has shown that the Government caused the aforementioned four delays. During those periods of delay, plaintiff was unable to proceed with any aspect of the project, as the need for power outages prevented both installation and testing at the respective times. Plaintiff was subject to a directive from the Navy before it could proceed. Moreover, the Government-caused delays were not concurrent with delays caused by plaintiff.

### 2) Delay increased original time for performance

The second prerequisite for *Eichleay* damages is a showing that the Government-caused delays increased the original time for performance, or if performance was completed within the original time, the contractor incurred additional expenses because it had anticipated finishing earlier. *Nicon*, 331 F.3d at 883.[10] The solicitation, as amended

---

9. *Eichleay Corp.*, 60–2 BCA ¶ 2688, 1960 WL 538 (1960), *aff'd on reh'g*, 61–1 BCA ¶ 2894 (1960).

10. In an earlier case the Federal Circuit held:
 > [W]here a government-caused suspension does not actually result in any extension of time for completion of the contract, i.e., the contract is completed on time as originally scheduled, the contractor suffers no injury. This is because, despite the delay, the contractor's original esti-

 mate of time required to complete performance remains accurate and the next contract can begin as anticipated. For this reason, we have not allowed such a contractor to recover indirect costs under the *Eichleay* formula unless the contractor ....
 > ... shows that from the outset of the contract it: (1) intended to complete the contract early; (2) had the capacity to do so; and (3)

by the Navy, required that the entire project be ready for use not later than two hundred calendar days after its commencement, which was ultimately set as June 11, 1996. However, due to various delays, some of which were caused by the Navy, plaintiff was unable to demobilize its equipment from the island until February 11, 1997.[11] Thus, plaintiff has established that it meets the second *Eichleay* prerequisite.

### 3) *Contractor on standby and unable to take on other work*

In determining whether a contractor was on standby and unable to take other work during the period of delay, the Federal Circuit directs that a "court should first determine whether the [Government] ... issued a written order that suspend[ed] all the work on the contract for an uncertain duration and require[d] the contractor to remain ready to resume work immediately or on short notice." *P.J. Dick*, 324 F.3d at 1371. In cases where no written order was issued, as occurred in the case at bar, the contractor must make a three-part showing.

"First, the contractor must show that the government-caused delay was not only substantial but was of an indefinite duration." *Id.* at 1370. The analysis hinges on uncertainty. *C.B.C. Enters. v. United States*, 978 F.2d 669, 675 (Fed.Cir.1992) ("The *raison d'etre* of *Eichleay* requires at least some element of uncertainty arising from suspension, disruption or delay of contract performance. Such delays are sudden, sporadic and of uncertain duration."). Thus, for example, if the Government suspended work, but alerted the contractor as to the date upon which work could recommence, the contractor could not be deemed to be on standby. *P.J. Dick*, 324 F.3d at 1371.

"Second, the contractor must show that during the delay it was required to be ready to resume work on the contract, at full speed as well as immediately." *Id.* This element "requires something more than an uncertain delay as this is a separate requirement of the case law; the implication is that the contractor must be required to keep at least some of its workers and necessary equipment at the site, even if idle, ready to resume work ...." *Id.*

"Our case law has not elaborated on this requirement, but it is clear that once the suspension period is over, the contractor must be required to be ready to 'resume full work immediately.'" *Id.* (citation omitted). However, if the Government gives a contractor time to reassemble its work force, the contractor cannot be deemed to be on standby. *See, e.g., Mech–Con Corp. v. West*, 61 F.3d 883, 887 (Fed.Cir.1995).

Plaintiff was unable to demobilize its equipment until the contract was completed, which required the submission of the coordination study. In order to complete the coordination study and be prepared to retest in the event of a failure, plaintiff was required to keep its equipment on the island and to be prepared to resume work. It was not until plaintiff received notice that the contract was terminated for convenience and Mr. Orlosky understood that plaintiff was under no further obligation that plaintiff demobilized its equipment. As plaintiff was not granted time to reassemble its equipment or workforce, plaintiff can be deemed to have been on standby.

"Third, the contractor must show effective suspension of much, if not all, of the work on the contract." *P.J. Dick*, 324 F.3d at 1370. Suspension does not require that the "workforce assigned to the contract ... [be] standing by," *Interstate Gen. Gov't Contractors v.*

actually would have completed early, but for the government's actions.
*West v. All State Boiler, Inc.*, 146 F.3d 1368, 1379 (Fed.Cir.1998) (quoting *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058–59 (Fed.Cir.1993)).

11. Mr. Orlosky maintained that the period of Government-caused delay was 213 days, while Mr. Smith testified to seventy-five days. Although the first DCAA audit "accepted the gov-

ernment determination of seventy-five days over the contractor's determination," Tr. at 783, the audit did not "take into account [the] interference by Public Works" based upon DCAA San Fernando Valley (Ca.) Branch Manager Frederick A. ("Fritz") Dallmer's misconception "that Public Works was a Ventura County organization" when it was, in fact, "an arm of the United States." Tr. at 781–82.

*West,* 12 F.3d 1053, 1057 n. 4 (Fed.Cir.1993), only that work on the contract has ceased or been delayed. *P.J. Dick,* 324 F.3d at 1372. As the Federal Circuit in *P.J. Dick* observed, government inaction, "such as failure to vacate spaces in which the contract was to be performed[,]" can effect a valid suspension. *Id.* at 1373. In the instant case, the Navy's inaction-its failures to schedule power outages and to allow plaintiff to complete testing-created suspensions of work under the contract.

If a contractor shows that there was a Government-caused delay of uncertain duration that prevented the seasonable completion of performance and that the contractor was on standby and unable to take on other work during that delay, it has made a prima facie showing of entitlement to *Eichleay* damages. Then, the "burden of production shifts to the government to show that it was not impractical for the contractor to take on replacement work and thereby mitigate its damages." *Id.* at 1370. The Government may not show merely that plaintiff took on any work during the period of delay; rather, it must show that plaintiff took on replacement work that "produced sufficient support of overhead costs to absorb all the overhead costs that the government contract would have, if work had not been suspended." *Melka Marine,* 187 F.3d at 1378; *see also West v. All State Boiler, Inc.,* 146 F.3d 1368, 1377 (Fed.Cir.1998) ("The critical factor, then, is not whether the contractor was able to obtain or to continue work on other or additional projects but rather its ability to obtain a replacement contract to absorb the indirect costs that would otherwise be unabsorbed solely as a result of a government suspension on one contract.")

Defendant contends that plaintiff is not eligible for *Eichleay* damages because plaintiff received revenue from other projects during delay periods, specifically "the Bremerton job," a Navy contract for a pier in Bremerton, Washington.[12] While Mr. Orlosky testified that he could not recall the exact dates of the Bremerton job, other evidence shows that plaintiff's performance in Bremerton had begun prior to commencement of the contract on San Nicolas Island.[13] Thus, the Bremerton job cannot constitute replacement work.

If defendant had met its burden of production, plaintiff would have borne the burden of persuasion to rebut defendant's evidence. *P.J. Dick,* 324 F.3d at 1370. However, defendant did not show that plaintiff took on replacement work or that it would not have been impractical for plaintiff to do so. Mr. Orlosky testified that the San Nicolas Island project was awarded as the Bremerton job neared completion and that any overlap between the San Nicolas and Bremerton contracts was limited to contract modification at Bremerton. Any services performed under the Bremerton project occurred during the period for which there is no claim.[14]

 Once it is established that plaintiff is eligible for *Eichleay* damages, the *Eichleay* formula directs the court to

(1) find the allocable contract overhead by multiplying the total overhead cost incurred during the contract period by the ratio of billings from the delayed contract to total billings of the contractor during the contract period; (2) find the daily contract overhead rate by dividing the allocable contract overhead by the number of days of contract performance; and (3) de-

---

**12.** The job was apparently terminated for convenience. Tr. at 812.

**13.** Mr. Orlosky wrote a letter on December 7, 1995, stating that he could be reached at an address in Bremerton. He testified that he was in Bremerton "finishing up a job[.]" Tr. at 66. The parties' stipulated that "[a]s of October 31, 1995, [plaintiff] was working on a project at Bremerton Naval Shipyard[.]" Stip. ¶ 18.

**14.** Mr. Dallmer further testified that his calculation of *Eichleay* damages accounted for any other contracts billed during the Government-

caused San Nicolas delays. According to Mr. Dallmer, "Those billings are used to calculate percentage by contract so that the unabsorbed [overhead] can be allocated to the contract .... The billings are used to calculate the allocation percentage ... which [was] ... unabsorbed, the total [overhead] is allocated to that contract and then that contract piece of that [overhead] is divided by the number of contract performance period to calculate the daily rate." Tr. at 787. Thus, no "replacement work" was completed during the Government-caused delay that was not considered by the DCAA.

termine the amount recoverable by multiplying the number of days of delay by the daily contract overhead rate.

*Melka Marine,* 187 F.3d at 1375 (Fed.Cir. 1999).

■ In determining these variables, the court looks to the DCAA audits for guidance. The DCAA, which performs all contract audits for the Department of Defense with reference to negotiation and settlement of contracts and subcontracts, performed two audits of Orlosky Inc. in connection with the San Nicolas Island project. Both audits included assessments of plaintiff's "accounting principles" and "significant estimates." The first audit, conducted in 1997, determined that plaintiff was not eligible for *Eichleay* damages because, among other reasons, plaintiff had not demonstrated that it met the elements necessary to recover. The 2000 audit, however, determined that plaintiff had experienced a Government-caused delay of seventy-five days.

Although plaintiff argues that "testimony from a DCAA auditor is to be given great weight[ ]" and that "neither the DCAA audit nor the government admissions should be summarily dismissed," Tr. at 1454, it is the practice in this circuit to consider these audits only as evidence in determining damages. *See generally Raytheon Co. v. White,* 305 F.3d 1354 (Fed.Cir.2002) (DCAA auditor's statements considered as testimony); *A.C. Ball Co. v. United States,* 209 Ct.Cl. 223, 531 F.2d 993, 1005 (1976) (DCAA audit data as one of several items of evidence, and of "relatively little weight" because auditor "colored his conclusions"). The United States Court of Claims has held:

> "Recoverable damages cannot be proved by a naked claim for a return of costs even where they are verified. The costs must be tied in to fault on defendant's part.... A schedule of verified costs ... is not proof of damages but only a starting point .... Such a schedule verified by defendant is not an admission of anything but the accuracy of the statement reflecting the contents of books and records examined and the allocations and computations based thereon."

*Boyajian v. United States,* 191 Ct.Cl. 233, 423 F.2d 1231, 1239 (1970) (quoting *River Constr. Corp. v. United States,* 159 Ct.Cl. 254, 270–71, 1962 WL 9302 (1962) (citing *F.H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 130 F.Supp. 394, 400 (1955))).

In *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 532 F.2d 739 (1976), a government contractor brought suit to recover costs from decreased productivity and increased end-product rejection, allegedly caused by the Government's delay. Relying on *Boyajian,* the Court of Claims ruled that, absent direct proof of causation, "[t]he DCAA audit verification of plaintiff's production and rejection figures did not, of course, amount to an admission of Government responsibility for decreased productivity." *Id.* at 741. This treatment of Government-verified calculations can be seen in more recent cases. *See, e.g., E.L. Hamm & Assoc. v. England,* 379 F.3d 1334 (Fed.Cir.2004) (quantum hearing required because DCAA audit not binding); *Hi–Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1381 (Fed.Cir. 2004) (trial court's use of DCAA audit in rendering damages upheld, but only because it was reasonable and fair to do so in light of all evidence); *FMC Corp. v. United States,* 853 F.2d 882, 887 (Fed.Cir.1988) (DCAA audit not "the only, or controlling, factor to consider in determining whether a practice has been approved or acquiesced in by the government .... Estoppel does not lend itself to such a single factor analysis, founded as it is on principles of equity").

Thus, while the DCAA audit does not constitute an admission on the part of the Government, plaintiff may offer it as one piece of evidence and, as with any other proof, attempt to bolster it. Ultimately, a plaintiff bears the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation. *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir.1987).

By its very nature, calculation of *Eichleay* damages is an imperfect science. "[C]alculation of contract damages is difficult," *Capital Elec. Co. v. United States,* 729 F.2d 743, 746 (Fed.Cir.1984), and "[t]o accurately deter-

mine how much unabsorbed overhead was caused by any one contract is impossible ...", *Wickham Contracting,* 12 F.3d at 1579. *See also Wickham Contracting Co. v. General Services Admin.,* 92–3 BCA ¶ 25,040 at 124, 818, 1992 WL 88326, *aff'd,* 12 F.3d 1574 (Fed.Cir.1994) ("It makes no difference what the actual overhead was. We are here dealing with theoretics which produce approximations because more precise results cannot be obtained."). " 'It is sufficient if ... plaintiff ... furnishes the court with a reasonable basis for computation, even though the result is only approximate.' " *Am. Line Builders, Inc. v. United States,* 26 Cl.Ct. 1155, 1181 (1992) (quoting *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)).

Branch Manager Frederick A. ("Fritz") Dallmer, an impressively professional emissary for the DCAA, could not vouchsafe the integrity of plaintiff's proof of damages at trial. The 2001 audit itself noted that "[t]he contractor's *Eichleay* calculation depart[ed] from general guidelines for its use by using a period other than the delayed contract's performance period." In its *Eichleay* calculation, plaintiff used costs and revenues for the period of April 1, 1996, to March 30, 1997. However, the DCAA determined that the contract commenced on November 23, 1995, and was completed approximately February 4, 1997. While the DCAA ultimately accepted plaintiff's methods, the court is not bound to do so.

Having independently examined plaintiff's evidence on damages in light of the integrity of the evidence itself and with full cognizance of the uniformly valid questions raised by the DCAA, the court finds that, while plaintiff has demonstrated Government-caused delays resulting in increased home office overhead, it has failed to present adequate evidence as to the amount of damages that it incurred. Plaintiff has relied heavily on the DCAA calculations, which do not adhere to the *Eichleay* formula. While proof of *Eichleay* damages calls for theoretics and approximations, the court cannot grant damages based on calculations that do not utilize correctly the exclusive formula for home office overhead damages calculations. Moreover, the court cannot " 'undertake to prepare' evidence," *See Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 67 Fed.Cl. 494, 498 (2005) (quoting *Fields v. United States,* 29 Fed.Cl. 376, 383 (1993), *aff'd,* 64 F.3d 676 (Fed.Cir.1995)), even if plaintiff had provided the raw data amenable to such an endeavor, which it has not.

### 2. *Other damages relating to delay*

While plaintiff did not sufficiently prove its *Eichleay* damages, it is also entitled to any non-extended overhead damages stemming from the delays. However, plaintiff must allege and prove such damages. *See Commerce Int'l Co.,* 338 F.2d at 86. Plaintiff contends that it offered acceptable proof of damages under one or all of the following three damage calculation methods: actual cost, total cost, and jury verdict.

The proper measure of these damages is "the difference between the reasonable cost of performing the work as changed and the amount it would reasonably have cost to perform the work originally specified." *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360, 1370 (1969) (internal quotations omitted). While measuring damages can sometimes be difficult, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision ...." *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969).

The court may employ several different methods to calculate these damages, but calculations based on actual costs to the plaintiff are preferred. *Propellex Corp. v. Brownlee,* 342 F.3d 1335, 1338 (Fed.Cir.2003) (holding that "the preferred way for a contractor to prove increased costs is to submit actual cost data because such data provides the court, or contracting officer, with documented underlying expenses ...." (internal quotations omitted)). The alternative methods of calculating damages—the total cost method, and the jury verdict method—may only be used when the actual cost method is not feasible. *Dawco Constr., Inc. v. United*

*States*, 930 F.2d 872, 880 (Fed.Cir.1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995); *S.W. Elec. & Mfg. Corp. v. United States*, 228 Ct.Cl. 333, 655 F.2d 1078, 1088–89 (1981).

■ The total cost method lessens the need to separate out and individually prove specific items of damage, by simplifying the process: Plaintiff need only compare its bid to its total cost to show its damages. *See S.W. Elec. & Mfg.*, 655 F.2d at 1086. However, this method is "sharp[ly] restrict[ed]" because the extra costs incurred must arise from the circumstances that warranted the equitable adjustment. *Id.* This makes total cost evidence "of little value when it is determined that the defendant is only liable for a portion of the plaintiff's losses." *Id.* at 1088. In fact, the total cost method may only be used when a four-part test is met:

> (1) [T]he nature of the particular losses makes it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

*WRB Corp. v. United States*, 183 Ct.Cl. 409, 426, 1968 WL 9146 (1968); *see also Propellex Corp.*, 342 F.3d at 1339; *Raytheon*, 305 F.3d 1354 at 1366.

■ The jury verdict method is even more liberal in the specific facts required than the total cost method, and it is "most often employed when damages cannot be ascertained by any reasonable computation from actual figures." *Dawco Constr.*, 930 F.2d at 880. It is "not favored and may be used only when other, more exact, methods cannot be applied." *Id.* To use a jury verdict method of damages, the court must make three findings:

> (1) that clear proof of the injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages.

*Id.* The plaintiff "bears the burden of establishing that no more reliable method is available than the 'guesstimate' of the 'jury verdict method' ...." *Id.* at 881 (internal citations omitted).

■ In the instant case, it is unnecessary to examine in detail all seven of the factors for the two tests, because plaintiff fails the first and third factors, respectively. These factors both require, in essence, that plaintiff could not prove its damages by a more exact method, such as the actual damage method. *See WRB Corp.*, 183 Ct.Cl. at 426("(1) [T]he nature of the particular losses makes it impossible or highly impracticable to determine [damages] with a reasonable degree of accuracy ...."); *Dawco Constr.*, 930 F.2d at 881("(2) [T]hat there is no more reliable method for computing damages ....") Furthermore, under both tests, a contractor's failure to prove damages by a more exact method must be reasonable, not simply due to a lack of effort on its part. *See Propellex Corp.*, 342 F.3d at 1342 (holding that contractor could not make use of total cost method simply because it "failed to keep accurate records, when such records could have been kept, and where the contractor does not provide a legitimate reason for its failure to keep the records"); *Dawco Constr.*, 930 F.2d at 881 (holding, in context of jury-verdict test, that plaintiff's "inability to substantiate the amount of [its] resultant injury by direct and specific proof" must be "justifiable" (emphasis omitted)). Instructively, when calculating damages "primarily involve[s] simply calculating the additional labor and material required," the situation is unlikely to be "peculiar" enough to use an alternative method of damage calculation. *S.W. Elec. & Mfg.*, 655 F.2d at 1087.

Plaintiff's damages in the instant case are not "peculiar." It could have submitted, and in many cases did submit, actual cost information on its damages. Moreover, any failures of damage proof were not due to the inexactness of the situation, but, rather, plaintiff's own failure to produce reliable information. Such failure cannot be used as justification "for lessening the burden of proof." *S.W. Elec. & Mfg.*, 655 F.2d at 1088. Therefore, the court holds this plaintiff to prove its damages via the actual damage method.

The court can find only two such sources of damages relating to compensable delays: the rental costs of the equipment and the cost of the damage to the equipment.[15]

First, plaintiff alleges that the equipment was damaged by saltwater and asks for the roughly $20,000.00 cost of repair. This saltwater damage would at first seem attributable to the delays that caused the equipment to remain for an extensive period. However, plaintiff does not claim that the equipment was damaged during the time on the island, but, instead, during the equipment's return on the barge. While plaintiff might normally have a negligence claim against the Government for this damage, the contract between plaintiff and defendant provided that the "contractor's materials and equipment [were] not eligible for shipment to the island ... until the contractor has signed the waiver ... absolving the government from any and all liability arising out of the shipment." Contract, § 1600, ¶ 1.7.9. Additionally, this claim is outside of the scope of damages caused by delay on the original contract.

■ Next, plaintiff alleges that the delays forced it to pay extra rent on the equipment that was idle on the island. The relevant delay periods, again, are as follows: March 22, 1996 to April 16, 1996, or twenty-six days; May 31, 1996 to June 13, 1996, or fourteen days; July 12, 1996 to August 22, 1996, or forty-two days; and August 26, 1996 to February 10, 1997, or 169 days.[16]

Plaintiff rented its equipment from Aon Equipment Rentals ("Aon"), and provided the invoices for the period of April 1996 through March 1997. No invoices regarding equipment rentals were provided for the month of March, 1996. Therefore, to the extent that plaintiff might have incurred damages for the period of March 22, 1996 to March 31, 1996, the court deems the damages not substantiated sufficiently. For the months of April 1996 through July 1996, plaintiff incurred rental costs of $7,033.00 per month, or $234.43 per day.[17] Beginning in August 1996, and ending in February 1996, plaintiff incurred rental costs of $13,239.00 per month, or $441.30 a day.

First, as mentioned above, the twenty-six day period from March 22, 1996, to April 16, 1996, must be reduced to the sixteen days in April because of the lack of proof of the March rental damages. Sixteen days at $234.43 per day yields $3,750.88 in damages for this period.

The May 31, 1996, to June 13, 1996 delay period is fourteen days. The applicable rate is $234.43 per day. The damages for this delay therefore are $3,282.02.

The July 12, 1996, to August 22, 1996 delay is forty-two days in length. Twenty of those days are in July, at a daily rate of $234.43 per day; this comes to $4,688.60. The other twenty-two days are in August, at a daily rate of $441.30, for a total of $9,708.60. The grand total for this period of delay is thus $14,397.20.

Finally, the August 26, 1996, to February 10, 1997 delay is 169 days in length. The applicable rate is $441.30 per day. There-

15. Plaintiff is also entitled to any costs stemming from the first, pointless REA application that it submitted due to the Navy's failure to make clear whether the February 11, 1997 end to the contract was a termination for convenience or a declaration that the work was usably complete. As discussed above, this amounted to a breach of good faith and fair dealing. However, the court can find no competent evidence of how much this REA application cost plaintiff to submit. It is clear from the evidence that plaintiff hired Mr. John and New Venture Development as government contract consultants to help with the REA. However, the court can locate no invoices regarding the price of these consulting services. The REA itself contains a page entitled "Subcontractors, Allocation of Consultant/Accountant to Various REAs." It lists a billed amount of some $70,000.00 for the combined consulting services of New Venture Development and Mr. John. However, it does not provide any underlying data for these supposed billings. The court does not view this evidence as sufficiently competent to support an award of damages.

16. In the case of the 169–day standby delay, Mr. Orlosky testified that all of the equipment rented was necessary if work was to suddenly resume, and the court credits this testimony.

17. The court will use an average month length of thirty days when calculating the daily rate. Plaintiff did not pay different rental costs for months of slightly shorter or longer lengths, so an average is appropriate.

fore, the damages for this period of standby delay are $74,579.70.

When added together, plaintiff sustained $96,009.98 in damages from the delays.[18] However, from this figure must be subtracted the amount that the Navy has already paid for delays. Contract Modification No. P00008 (Oct. 18, 1998), contained an adjustment in the amount of $18,443.00 for the "costs of delays." Mr. Smith testified that $14,455.00 of the $18,443.00 was paid to cover plaintiff's equipment rental expenses. While Mr. Smith's testimony lacked gravitas, in this case it was supplemented by a spreadsheet listing expenses prepared at the time the modification was made, which itemized $14,455.00 of the modification for "rental equipment." [19] DX 70. The court credits this number and will subtract $14,455.00 from the $96,009.98 of rental delay damages, reducing the total to $81,554.98.

While this figure certainly could not purport to account for every deficiency in plaintiff's proof at trial, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ." *Elec. & Missile Facilities*, 416 F.2d at 1358. Based on its independent examination of the invoices, audits, and other evidence regarding costs for equipment rental, the court credits this number, and therefore awards plaintiff $81,554.98 in rental costs.

Additionally, plaintiff should receive the $6,500.00, plus markup, that defense counsel conceded. (The Government "owe[d] Orlosky for the new single-line drawing and the gathering of Dapper data . . . ." Tr. at 1472.)

## CONCLUSION

This is the *rara avis* that merits a comment, offered only as a suggestion, with respect to the advisability of plaintiff's submitting an application for attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (2000).

While obtaining an award qualifies plaintiff as a prevailing party, in that it has secured a judgment on the merits, plaintiff is by no means a compromised party. The spectacle of the Navy's studied ineptitude throughout the San Nicolas Island project was matched only by plaintiff's maladroitness. Plaintiff failed to avail itself of the opportunity to view the site prior to making its bid. Its presentation of evidence exaggerated the dangers and problems it faced throughout the project, while the particulars relating to costs sustained were inadequate. The Government was more than substantially justified in defending against this lawsuit. Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. By November 7, 2005, the parties shall file a stipulation of the amount due plaintiff on the Power System Testing Co. invoice and the date on which the Navy received plaintiff's claim.

2. Based on the Navy's breach of the covenant of good faith and fair dealing, plaintiff is entitled to an award of $81,554.98 for delays caused by the Navy.

---

18. The court notes that the DCAA, in its audit of plaintiff's rental costs, subtracted the baseline bid for rental costs from its total, as well as the cost of the damaged rental equipment. Although neither of these figures is included in the court's calculation, because the method the court uses to calculate plaintiff's rental damages is different than the DCAA's method-the court uses actual cost data on rentals, rather than the DCAA's average daily rate-subtracting the bid and equipment damage figures is unnecessary under the circumstances.

19. This exhibit was admitted over objection for the limited purpose of showing how the $18,443 modification might be a credit to defendant's damages.