**MELKA MARINE, INC.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 98–5149.**

United States Court of Appeals,
Federal Circuit.

Aug. 12, 1999.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Oct. 7, 1999.

Peter Paul Mitrano, Etna, New Hampshire, argued, for plaintiff-appellant.

Franklin E. White Jr., Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for defendant-appellee. With him on he brief were David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director.

Before MAYER, Chief Judge, MICHEL, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Melka Marine, Inc. ("Melka") appeals from the decision of the United States Court of Federal Claims, dismissing Melka's complaint which sought damages in connection with a waterfront construction contract awarded by the United States Department of the Navy. *See Melka Marine, Inc. v. United States,* 41 Fed.Cl. 122 (1998). After denying a motion and cross-motion for summary judgment, the Court of Federal Claims conducted a one-day trial on November 24, 1997. On June 10, 1998, the Court issued an opinion and order denying Melka's claims in their entirety and dismissing Melka's complaint. Melka appeals, contending that it has proven it is entitled to damages stemming from government-caused delay between November 16, 1994 and March 30, 1995. Because the Court applied an incorrect test and Melka has shown that it may be entitled to recover at least some damages for a portion of the time period (if the correct test is used), we affirm-in-part, vacate-in-part, and remand for further proceedings in accordance with this opinion.

## BACKGROUND

On October 17, 1994, the United States (the "government"), through the Department of the Navy, awarded Melka a contract that included dredging work in the Potomac River near Washington, DC, as well as the construction of a breakwater, repairs to an existing boat ramp, a quaywall, and a finger pier, and various other repair work. The contract required the government to obtain a dredging permit from the United States Army Corps of Engineers prior to the commencement of the dredging and breakwater work, but not for the repair work.

On November 4, 1994, the government notified Melka that the permit had not yet been obtained, but was expected at any time. In the meantime, the government noted that no "dredge work can start until this permit is approved, however, construction repairs are not dependent on this permit." Melka mobilized all of its equipment to the job site by November 15, 1994.

On November 16, 1994, Melka sent a letter to the government stating that Melka's proposed schedule for completing the work, previously submitted, would be negatively impacted by the government's failure timely to obtain a permit and that, as requested, it would re-sequence the work to avoid inactivity. The government did not respond to this letter. On November 21, Melka began the re-sequenced work by starting work on the boat ramp. Work was suspended the next day, however, due to the discovery of a six-inch pipe in the ramp and the discovery of a prior boat ramp beneath the existing ramp, which would necessitate a different ramp design.

As a result of these delays and the delay in obtaining a permit, on November 29 the government issued a formal "Suspension of Work" order. The order suspended the commencement of dredging and breakwater work "for an indefinite period." Two days later on December 1, the government revised its "Suspension of Work" order. The letter stated in part:

> The Corps of Engineers permit for this project is not expected to be approved until mid-January or mid-February. Therefore, all work relating to the dredging and breakwater repairs cannot begin until the permit is received.

> Work may commence on the repairs to the quaywall and to the finger pier.... All equipment on site that will not be utilized on the repairs to the boat ramp, quaywall, or finger pier can be demobilized. Take any other steps necessary to minimize the incurrence of

costs due to the suspension of permit related work.

By December 27, 1994, Melka had demobilized its dredging and breakwater equipment while it continued the re-sequenced repair work, which was substantially completed by January 4, 1995.

Melka later mobilized its dredging and breakwater equipment elsewhere for use on other jobs. The two most significant jobs that Melka undertook during this period were the Steuart Petroleum project from January 4–18, 1995, and the Leesylvania Park project from January 20, 1995 through March 31, 1995. Melka originally scheduled these jobs to be performed after the government project, but the government-imposed delay allowed Melka to perform these jobs earlier.

Melka also bid on other projects during this period which it did not receive, but that it would have been able to perform at some point had they been awarded the projects. Indeed, Leonard Melka testified that Melka bid upon "every project [that it] could find to bid on." Counsel for Melka also indicated at trial that Melka did not turn down any work that had been offered to it during the January time frame.

On February 2, 1995, the parties met to discuss the continuing delay in obtaining the permit. At the meeting, the government informed Melka that work on the dredging and breakwater, rather than commencing in February 1995, could not begin until October 15, 1995, and requested that it agree to perform this work under the original contract price. By letter dated February 14, 1995, Melka agreed and proposed a completion date of February 29, 1996.[1] All work was completed by February 1996.

On appeal, as below, Melka asserts that it is entitled to recovery of its unabsorbed overhead from November 16, 1994 through March 30, 1995.[2] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (1994).

## DISCUSSION

### I.

■ We review legal conclusions of the Court of Federal Claims *de novo*, while its factual findings at trial are reviewed for clear error. *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998).

■■ Melka alleges that it is entitled to reimbursement of its unabsorbed home office overhead costs caused by the government's delay as calculated by the formula articulated in *Eichleay Corp.*, ASBCA No. 5183, 60–2 BCA (CCH) 2688, 1960 WL 538 (1960).[3] The *Eichleay* for-

---

1. Three contract modifications were also entered into. Modification P00001, proposed by the government on March 30, 1995, was a bilateral modification that extended the time for performance through February 29, 1996 and compensated Melka for remobilization/demobilization costs associated with the postponement of the work until October 15, 1995. Modification P00002 was a bi-lateral modification that compensated Melka for costs arising from the changed condition of the quaywall and for the delay caused by the discovery of the pipe in November 1994. Modification P00003 was a unilateral modification compensating Melka for overhead and field costs arising from the costs associated with performing the work out of sequence and for its dredging and breakwater equipment for twelve days.

2. Melka also alleges that it is entitled to direct costs for idle equipment and labor expenses,

but we find Melka's arguments on these issues without merit, and not warranting specific discussion.

3. Determining the amount of recoverable damages under the *"Eichleay* formula" requires three steps: (1) find the allocable contract overhead by multiplying the total overhead cost incurred during the contract period by the ratio of billings from the delayed contract to total billings of the contractor during the contract period; (2) find the daily contract overhead rate by dividing the allocable contract overhead by the number of days of contract performance; and (3) determine the amount recoverable by multiplying the number of days of delay by the daily contract overhead rate. *See Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1577 n. 3 (Fed.Cir. 1994).

mula is the only means approved in our case law for calculating recovery for unabsorbed home office overhead. *See E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1372 (Fed.Cir.1999). Home office overhead typically includes accounting and payroll services, salaries for upper-level managers, general insurance, utilities, taxes, and depreciation. *See Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed.Cir.1993).

■ Melka must satisfy two requirements in order to show that it is entitled to *Eichleay* damages: (1) the government required the contractor to stand by during government-caused delay of indefinite duration; and (2) while and because of standing by, the contractor was unable to take on other work. *Interstate*, 12 F.3d at 1056. If the contractor can make out a *prima facie* case of (1) above, i.e., that the government-imposed delay was uncertain and that the government required the contractor to remain on standby, ready to resume full work immediately, the burden shifts to the government to show either (1) that it was not impractical for the contractor to obtain "replacement work" during the delay, or (2) that the contractor's inability to obtain such work, or to perform it, was not caused by the government's suspension. *See West v. All State Boiler, Inc.*, 146 F.3d 1368, 1376 (Fed.Cir.1998).

### A.

For the time periods from November 16, 1994 to January 4, 1995 and February 2, 1995 to March 30, 1995, the Court of Federal Claims correctly applied the law and did not clearly err in its factual findings when it concluded that Melka was not entitled to *Eichleay* damages because, it found, Melka was not on indefinite duration standby during those time periods. By failing to meet the "standby" requirement, Melka's claims for *Eichleay* damages during these periods must fail, even in the absence of government rebuttal evidence because Melka failed to establish a *prima facie* case of entitlement to *Eichleay* damages.

■ With respect to the earliest time frame, from November 16 (the beginning of Melka's alleged damages period) to November 29, 1994 (the date the government issued the formal Suspension of Work order), the Court of Federal Claims found that no government-imposed delay in fact occurred; therefore Melka could not have been on "standby" during this period. Although the government had failed to obtain a permit for the dredging and breakwater work, the parties had agreed that Melka would re-sequence its work so that non-permit related work could be done during this period, and Melka did so. The Court of Federal Claims did not clearly err in finding that Melka was not on standby when it was working on the contract and the government had not suspended all contract work.

■■ With respect to the second time period, from November 29, 1994 to January 4, 1995 (the approximate end of Melka's performance of all those contract tasks not dependent upon issuance of the permit), the Court of Federal Claims found that Melka was still not on standby. Although the government issued a suspension of work order at the beginning of this period, that order directed Melka to perform non permit-related work and indicated that the dredging permit would not be obtained until January or February, 1995. After the suspension of work order, Melka continued to work on the contract (with re-sequenced work) and did so on a virtually uninterrupted basis through January 3, 1995. Melka argues that because the dredging and breakwater work accounted for a significant amount of the work in the government contract, that once such work was suspended indefinitely Melka was on standby. Melka's argument would be more convincing if the entire government contract related to dredging and breakwater work, so that the suspension of work order effectively stopped any work on the contract. However, this was not the case. Other significant repair work required under the contract was performed through

January 3, and the suspension of work order directed Melka to perform such work. Melka cannot establish that it was on standby by dividing the contract into one portion that was able to be performed (the repairs) and another that was on standby (the dredging and breakwater work), because the contract required that both types of work be performed. If work on the contract continues uninterrupted, albeit in a different order than originally planned, the contractor is not on standby. Given these facts, the Court of Federal Claims did not clearly err in finding that Melka was not on standby during this period.

■ During the latest time period, from February 2, 1995 (when the government informed Melka that permit-related work could not begin until October 15, 1995) to March 30, 1995 (the last date that Melka seeks recovery), the Court of Federal Claims found as a fact that Melka could not have been on standby because it knew then with certainty that it could not be called on to perform the work before October 15. This finding is not clearly erroneous because "standby" requires an *uncertain* delay period where the government can require the contractor to resume full-scale work at any time. Here, Melka knew that it would not be called on to work on the contract until October 15. Nor was the government requiring Melka to keep at the Potomac River site its dredging and breakwater equipment. Rather, they were free to be moved and used elsewhere. Thus, *Eichleay* damages could not be awarded for this time period either.

### B.

■■ The penultimate time period, from January 4, 1995 (when Melka completed those contract tasks not dependent upon receipt of the permit) to February 2, 1995 (the date when the government and Melka agreed that the permit-related work would not commence until October 15, 1995), however, presents a different issue because the government concedes that Melka was on standby of indefinite dura-

tion during this period. The issue then becomes whether the government satisfied its burden of showing that it was not impractical for Melka to obtain replacement work or that Melka's inability to obtain replacement work was due to circumstances not related to the government-caused delay. *See All State,* 146 F.3d at 1376. The burden on the government, however, is one of production only—Melka still bears the ultimate burden of persuasion that it was impractical for it to obtain sufficient replacement work. *See Satellite Elec. Co. v. Dalton,* 105 F.3d 1418, 1421 (Fed.Cir.1997) ("Despite the shift in the burden of production, the contractor must nevertheless 'establish ... (3) that it was unable to take on other work.' *Altmayer v. Johnson,* 79 F.3d 1129, 1133 (Fed.Cir. 1996).").

In an effort to satisfy its burden, the government argues that Melka's work on the Steuart Petroleum and Leesylvania Park projects constitutes "replacement work." Those projects, according to the government, could not have been performed if Melka had been performing the dredging and breakwater parts of the government contract because, as Melka admits, it could only take on one such large dredging project at a time. The government also argues that Melka would have taken on more work had its bids been successful and the economy been stronger, both reasons unrelated to the government's delay and suspension of work. Melka argues that the projects it took on were not "replacement work" because they were relatively small in comparison to the work on the government contract and were merely moved up in its schedule in order to mitigate its losses as a matter of good faith.

The Court of Federal Claims, which did not have the benefit of the *All State* case when it made its decision, noted that Melka performed several other projects while on standby and bid, unsuccessfully, on several others. The Court of Federal Claims stated that the "key to *Eichleay* damages

is the ability to do other work," and concluded that "[b]y obtaining and bidding on other work, it is reasonable to infer that it had the capacity to perform work it obtained." *Melka*, 41 Fed.Cl. at 127. On this basis, the Court of Federal Claims held that Melka was not entitled to any *Eichleay* damages for this time period.

■ We hold the Court of Federal Claims applied the wrong legal test by improperly focusing on Melka's ability to take on *any* other work during the delay period as a basis for holding that Melka was not entitled to any *Eichleay* damages. The test was incorrect because it failed to include a quantitative analysis. Although the incorrect test was applied by the Court of Federal Claims, its confusion was understandable given that *All State* was not decided by this court until after the Court of Federal Claims rendered the decision here reviewed. *See Interstate*, 12 F.3d at 1055 (holding that the incorrect legal test for "standby" was applied, in part because of the unavailability of later, clarifying decisions of this court).

Also, at the time the Court of Federal Claims rendered its decision, this court's most recent application of the *Eichleay* formula was in *Satellite Electric*, portions of which could be read to indicate that if a contractor is able to perform *any* additional work during the delay that such circumstances will entirely defeat its claim for *Eichleay* damages. In *Satellite Electric*, we said:

> Finally, we reject Satellite's argument that the government had not rebutted Satellite's *prima facie* case because it had not shown that the additional work Satellite sought was *intended* to replace the suspended work. The work Satellite sought during the time of suspension, if Satellite had obtained it, necessarily would have replaced the suspended work.

105 F.3d at 1423 (emphasis added). While acknowledging that this reading of *Satellite Electric* was plausible "at first glance," this court in *All State* concluded that "in context [the statement in *Satellite Electric* ] appears to respond to the contractor's attempt to incorporate an 'intent' element into the government's rebuttal burden of proof," and therefore did not contradict the conclusion reached by the *All State* court that "additional work is not automatically considered replacement work which would preclude recovery under the *Eichleay* formula." *All State*, 146 F.3d at 1377 n. 2; *see also* Fred D. Wilshusen, *Hard Hat Case Notes*, 18 Construction Lawyer 41, 41 (A.B.A. Oct. 1998) (noting that the "intention of the decision" in *Satellite Electric* was not to require "a viable contractor to cease its normal operation and quit bidding work to recover under the *Eichleay* formula" and that *All State* properly rejected such an overly literal interpretation of language in *Satellite Electric* ). One commentator has noted:

> Satellite had argued that the Government was required to demonstrate that the additional work Satellite sought was not part of Satellite's planned or normal stream of work but instead was intended to replace the government-delayed work.... Two commentators have remarked that if this statement is interpreted literally, *Satellite Electric* can be read to mean that if a contractor bids on, or is capable of obtaining, additional, but not substitute, work during the delay period, the contractor will not be entitled to *Eichleay* damages. Both from a legal and an accounting perspective, it seems unlikely that the court intended such a construction.

Scott M. McCaleb, in *1997 Year in Review: An Analysis of the Federal Circuit's Government Contracts Decisions*, Pub. Cont. L.J. at 495, 530–31 (A.B.A. Spring 1998) (footnotes omitted). Thus, the appropriate inquiry, per *All State*, is whether the government established through rebuttal evidence or argument that Melka was able to take on "replacement work," not just any additional work. The Court of Federal Claims, however, did not address this point, but instead appeared to view *any* additional work performed or bid on by Melka as sufficient to bar its claim for

*Eichleay* damages, totally. We are unable to discern from the record before us whether the work performed or bid on by Melka during this time frame was "replacement work," and even if so, produced sufficient support of overhead costs to absorb all the overhead costs that the government contract would have, if work had not been suspended. Therefore, the case is remanded to the Court of Federal Claims for a determination of this issue.

## C.

On remand, the Court of Federal Claims should bear in mind the heavy burden that falls on the government once a contractor has established its *prima facie* case of entitlement to *Eichleay* damages. As this court has stated,

> We note that in very few cases where the contractor can demonstrate it was on standby during the suspension will the government be able to demonstrate that it was not impractical for the contractor to take on replacement work. This does not persuade us, however, that either the test or the burden should be altered. First, the government has the ability to control whether a contractor is on standby status during a suspension of work. By fixing, at the outset of the suspension period, a future date on which the contractor will be expected to return to work, or by allowing the contractor a "remobilization" period at the end of the suspension period, the government avoids keeping the contractor on standby during the suspension and thus avoids liability for unabsorbed overhead expenses in the future.

*All State,* 146 F.3d at 1380 (citation omitted); *see also Mech–Con Corp. v. West,* 61 F.3d 883, 886 (Fed.Cir.1995) ("[W]e have also recognized the impracticality of a contractor obtaining replacement work or reducing home office overhead when it must 'standby' during an 'uncertain' period of government-imposed delay."); *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1577–78 (Fed.Cir.1994) ("When the period of delay is uncertain and the contractor is required by the government to remain ready to resume performance on short notice (referred to as 'standby'), the contractor is effectively prohibited from making reductions in home office staff or facilities or by taking on additional work."); *Interstate,* 12 F.3d at 1057–58 ("When the period of delay or suspension is uncertain ... and the contractor is required by the government to remain ready to resume performance on short notice ['standby'], the contractor is effectively prohibited from mitigating such overhead costs."); *C.B.C. Enters., Inc. v. United States,* 978 F.2d 669, 675 (Fed.Cir. 1992) ("As a result [of standby status], it is impractical for the contractor to take on other work during these delays."). Nevertheless, the government may be able to show that Melka was not injured by the delay. *See All State,* 146 F.3d at 1380–81 ("[D]ifficult economic conditions that exist independent of the government's actions with respect to a delay in performance may prevent a contractor from obtaining replacement work, although this circumstance is in no way attributable to the government's delay."); *Satellite Elec.,* 105 F.3d at 1422 (contractor's inability to obtain other work was due in part to limitations in its security bond and a difficult competitive situation which were not due to the government delay). For example, the government argues that part of Melka's inability to obtain work was due to cold winter weather, rather than the government-caused delay and requirement to stand by. Such evidence bears directly on the issue of what caused Melka's inability to obtain adequate replacement work, if in fact it was unable to obtain such work. Or, if bad weather prevented performance of work that was obtained, that circumstance hardly results from the government-caused delay.

It is also important to keep in mind what does *not* constitute replacement work. For example, the government cannot rebut Melka's *prima facie* case of entitlement to *Eichleay* damages "simply by showing that the contractor continued its normal operations, including continuing to

bid on and perform 'additional' contracts." *All State*, 146 F.3d at 1376; *see also Altmayer v. Johnson*, 79 F.3d 1129, 1135 (Fed.Cir.1996) ("That [contractor] may have bid on other contracts 'at the very end' of the subject contract, does not establish that it was able to reduce its overhead or take on other work during the delay."). As this court stated in *All State*,

> it would be inconsistent with the purpose behind *Eichleay* recovery to require a contractor to cease all normal, on-going operations during a government-caused suspension on one contract in order to guarantee its recovery of unabsorbed overhead costs. A healthy contractor may well be simultaneously engaged in multiple contracts, at different phases of performance. A government-imposed suspension during performance of one contract will not necessarily affect a contractor's ability to obtain and perform others.

*All State*, 146 F.3d at 1376. Bidding on other projects can also support, rather than undercut, a contractor's argument that it was impractical for it to obtain replacement work, particularly if the projects that are bid upon could not be commenced and/or completed within the government-caused delay. In this case, for example, Melka argues that it could not obtain replacement work by bidding on other projects because such work involves substantial lead-up times that would render it impossible to begin the project, much less complete it, in a reasonable period of time, much less before the suspension is lifted. With respect to the contract at issue here, for example, three and a half months elapsed from the time the project was advertised until work actually commenced. Such commercial realities in the relevant market may be highly material when determining whether it was impractical to obtain any replacement work, or sufficient replacement work.

 Finally, the relative sizes of the projects at issue in terms of dollar amount, timing, and duration are relevant when determining whether a particular project is in fact "replacement work," as opposed to merely "additional work" in the ordinary course of business for a contractor that routinely performs multiple contracts, including simultaneously. The key is the potential for the new work to contribute a comparable amount to the contractor's overhead as the government contract would have absent the suspension, assuming that the time durations are also comparable. As we have noted in the past, however, "replacement work" need not be identical in size, duration, or type as compared to the delayed work. *See id.* at 1377. Indeed, in *All State* we said:

> [A] replacement contract might be a contract different in size or duration from a contractor's ordinary type of work (for example, a $100,000 contract by a contractor who normally obtains multi-million dollar contracts), or a contract for a different type of work (for example, a repair contract rather than new construction). The critical factor, then, is not whether the contractor was able to obtain or to continue work on other or additional projects but rather its ability to obtain a replacement contract to absorb the indirect costs that would otherwise be unabsorbed solely as a result of a government suspension on one contract.

*Id.* Therefore, the government can effectively rebut a contractor's *prima facie* case and show that a claimant is not entitled to any *Eichleay* damages by showing that it was not impractical for the contractor to take on true replacement work and that work would contribute the same amount of money for the same time period toward overhead costs as the government contract would have, had the delay not occurred. On the other hand, if the same amount of money is not contributed to the overhead costs in the same period by the replacement work, then the contractor should be able to obtain at least some *Eichleay* damages.

The relevance of the dollar amount, timing, and duration of the replacement work vis-a-vis the government contract may be

best illustrated with examples. Although not realistic, these examples illustrate the principles clearly. Imagine, first, that a contractor has established its *prima facie* case and that the government-caused delay in question although indefinite at the start turned out to be thirty days, with an overhead rate on the contract of $1000 per day. Also assume that it was not impractical for the contractor to obtain at least some "replacement work." If the government shows that it was not impractical for the contractor to obtain three ten-day replacement contracts and perform them consecutively during the delay, and each contract contributed $1000 or more each day to overhead costs, then *all Eichleay* damages would be precluded because all of the overhead costs would be absorbed by the replacement work. Without unabsorbed, indeed unabsorbable, overhead, there is no basis for *Eichleay* damages. Next assume that the government shows that it was not impractical for the contractor to obtain one replacement contract that lasted ten days and for each day it contributed $1000 to overhead. Then, the contractor is still entitled to *Eichleay* damages for the remaining twenty days of delay. In another example, assume that the government shows that it was not impractical for the contractor to obtain one thirty-day replacement contract that contributed $500 per day to overhead costs. Then *Eichleay* damages would not be precluded because roughly half of the overhead costs would remain unabsorbed.

▮ Of course, the government need not show that the contractor actually obtained replacement work, but can merely show that it was not impractical to do so. But even so, the government cannot preclude the recovery of all *Eichleay* damages by showing that some additional work could have been obtained, or by showing that some replacement work was obtained although it failed to fully offset all of the overhead shortfall created by the government's delay. Such a standard indeed places a heavy burden on the government, but the burden is appropriate when "the government has the ability to control whether a contractor is on standby status during a suspension of work." *All State*, 146 F.3d at 1380. The government can avoid the difficulty of meeting the burden simply by not putting the contractor on standby. If, on the other hand, the government so values quick start-up and early completion once the suspension of work is lifted, then it will order indefinite standby, knowing of the possible liability. That is as it should be. Certainly, freedom of action should be left to the government and the contractor. The court is the least equipped to decide such things.

The discussion of examples above is meant to guide the trial court's analysis on remand, which is necessary because the record before us does not clearly indicate whether the work performed and bid on by Melka qualifies as "replacement work" under present case law of this court. Because ·the trial court applied an incorrect legal test and Melka has shown that it may have been unable to obtain sufficient replacement work during this time period, we vacate the decision of the Court of Federal Claims to the extent that it denied *Eichleay* damages during the time period of January 4 to February 2. And we remand for a re-determination of this issue, possibly after receiving additional evidence, briefing, and/or argument from the parties, as the trial court sees fit.

### III.

For the time periods between November 16, 1994 and January 4, 1995, and between February 2, 1995 and March 31, 1995, the Court of Federal Claims determined that Melka was unable to show that it was on standby and therefore held it was ineligible for *Eichleay* damages. We affirm those portions of its decision. With respect to the time period between January 4, 1995 and February 2, 1995, however, the Court of Federal Claims applied an incorrect legal standard to Melka's claims. We vacate that portion of its decision and remand for a re-determination under the correct test of whether Melka is entitled to

*Eichleay* damages for that period, either fully or in part. Accordingly, the decision of the Court of Federal Claims is

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*

### COSTS

No costs.