# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Rex Systems Inc. | ) | ASBCA No. 59624 |
| | ) | |
| Under Contract No. SPRMM1-12-P-YH36 | ) | |

APPEARANCE FOR THE APPELLANT:     Ms. Nicole L. Kornesczuk
                                  President

APPEARANCES FOR THE GOVERNMENT:   E. Michael Chiaparas, Esq.
                                    DCMA Chief Trial Attorney
                                  Kara M. Klaas, Esq.
                                    Trial Attorney
                                    Defense Contract Management Agency
                                    Chantilly, VA

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

In this appeal, we consider what compensation appellant, Rex Systems, Inc. (Rex), is entitled to for the government's termination of its contract for convenience. Although the contracting officer made an offer to settle Rex's termination costs, Rex alleges that the government imposed significant costs upon it through delay during the performance period and seeks payment of an amount greater than it would have been entitled to had the contract been completed in a timely manner. The parties also dispute Rex's entitlement to other components of its termination claim. For the most part, the government prevails, although Rex is entitled to some relief, as will be detailed below.

The parties waived a hearing and submitted the case upon the record pursuant to Board Rule 11. We granted Rex's request to have the declaration of its corporate officer Nicole Kornesczuk (which had been previously submitted in tab 9 of its supplement to the Rule 4 file) stand in for its opening brief, rather than requiring it to submit a more formal brief. Ms. Kornesczuk also filed a reply brief. The government filed an opening brief, but did not file a reply, stating that it believed that its opening brief addressed all the issues raised in the Kornesczuk affidavit.

## FINDINGS OF FACT

1. On 2 August 2012, the Defense Logistics Agency (DLA) awarded to Rex Contract No. SPRMM1-12-P-YH36 (the contract) in the amount of $42,096 for the production of certain semiconductor devices (R4, tab 1). These devices were electronic assemblies utilized to support the MK-49, a Department of Defense legacy

system and provided electro-magnetic pulse protection (app. supp. R4, tab 9, ¶ 5, tab 6 (provision of electro-magnetic pulse protection)). Rex had delivered the same assemblies for DLA in a previous contract (app. supp. R4, tab 9, ¶ 10).

2. The contract required first article testing prior to the delivery of the eight devices (R4, tab 1 at G-2). It thus included the following schedule:

> Submission of test procedures for first article and production lot items: 60 days after contract award.
>
> Approval of test procedures: 120 days after contract award.
>
> Submittal of first article test sample and first article test report: 180 days after contract award.
>
> Approval of first article: 270 days after contract award.
>
> Shipment of production quantity and production lot test report: 360 days after contract award.

(*Id.*)

3. The contract also contained a number of standard Federal Acquisition Regulation (FAR) clauses, including FAR 52.213-4, TERMS AND CONDITIONS—SIMPLIFIED ACQUISITIONS (OTHER THAN COMMERCIAL ITEMS (OCT 2010), paragraph (f) Terminations clause (R4, tab 1 at G-18); and FAR 52.209-3, FIRST ARTICLE APPROVAL—CONTRACTOR TESTING (SEP 1989) (*id.* at G-20-21).

4. Relevant here, the termination clause in FAR 52.213-4(f) provides, in part, that, upon notification of termination for the convenience of the government:

> [T]he Contractor shall immediately stop all work...and...cause...all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges that the Contractor can demonstrate...have resulted from the termination.

(*See* R4, tab 1 at G-18)

5.  Also relevant to this matter, are two portions of the First Article Testing clause, FAR 52.209-3, the first of which provides in part:

> (b)  The Contractor shall submit the first article test report within 180 calendar days from the date of this contract.... Within 90 calendar days after the Government receives the test report, the Contracting Officer shall notify the Contractor...of the conditional approval, approval, or disapproval of the first article....
>
> ....
>
> (f)  If the Government does not act within the time specified in paragraph (b)...the Contracting Officer shall, upon timely written request from the Contractor, equitably adjust under the Changes clause of this contract the delivery or performance dates and/or the contract price, and any other contractual term affected by the delay.

(R4, tab 1 at G-20)

6.  The second material portion of the First Article Testing clause, FAR 52.209-3(g), relates to recoverable costs and warns that:

> Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor.  Before first article approval, the costs thereof shall not be allocable to this contract for...termination settlements if the contract is terminated for the convenience of the Government.

(R4, tab 1 at G-20-21)

7.  The contract also contained a standard Navy supplemental provision regarding pre-manufacturing test procedures (NAVSUPWSSIA05) further limiting the government's liability in a termination settlement for the contractor's acquisition of materials, which provided that:

> Prior to approval of [first article test procedures], the acquisition of materials or components for...the contract items (including first article samples) shall be at the sole risk of the contractor, and costs incurred on account thereof shall not be allocable to this contract...for the

3

purpose of termination settlement if this contract is terminated for convenience of the Government prior to approval of the [first article test procedure].

(R4, tab 1 at G-16)

8. In light of its having furnished the same items to the government in an earlier contract, on 14 August 2012, Rex requested that the government waive the contract's first article testing requirement (app. supp. R4, tab 1, tab 9, ¶ 15). On 19 September 2012, the government denied this request (app. supp. R4, tab 1).

9. Before receiving the government's response to the first article test waiver request, on 30 August 2012, Rex contacted a parts supplier (USI Electronics) and ordered the production materials (the diodes) necessary to construct the first article and the other seven semiconductor devices required by the contract (supp. R4, tab 24 at G-195-96). Rex's pre-bid estimate noted that the diodes required a 24-week lead time (R4, tab 23 at G-170-71). Nevertheless, the materials were requested for delivery on 15 October 2012, and were received by Rex on 24 September 2012 (*id.* at G-195-97). The cost of these items was $8,979 (*id.*).

10. On 27 September 2012, Rex timely submitted its first article and production test procedures to the government for its approval (app. supp. R4, tab 2).

11. Without waiting for government approval of its test procedures, on 28 October 2012, Rex built the first article semiconductor device and conducted tests upon it (app. supp. R4, tab 5, *see also* tab 6 (photograph of completed semiconductor device)).

12. The government did not approve the proposed testing procedures within 120 days of contract award (or by 30 November 2012), as required by the contract. Rex contacted the government on 6 December 2012 and inquired about the status of the approval (app. supp. R4, tab 3 at 4). The contracting officer (CO) forwarded Rex's correspondence to the appropriate technical personnel for review and noted, in an email on 13 December 2012, that "we [the government] are in breach of the delivery schedule in the contract" (*id.* at 2).

13. On 14 January 2013, a government technical representative contacted Rex and requested that Rex provide him with a technical data package for the contract items as well as a list of the drawings that had been provided in Rex's 27 September 2012 submittal (app. supp. R4, tab 1 at 2, tab 9, ¶ 17). He explained that his concern was that

4

Raytheon had changed some of the specifications in the six years since Rex last provided the semiconductor devices[1] (*id.*). This information was duly provided by Rex (*id.*).

14. The government made a follow-up request to Rex for additional information regarding the drawings and specifications on 18 January 2013 (app. supp. R4, tab 4 at 4-5). When this request was forwarded by Rex's contract administrator to Rex's engineering personnel, Rex's founder and senior director, Mr. G. Rex Rathbun, became aware of it and decided that it was an inappropriate request (app. supp. R4, tab 9, ¶ 18). Accordingly, on 23 January 2013 Mr. Rathbun sent a letter to the CO, complaining that the documents sought by the government on 14 January 2013 and provided by Rex that same date were proprietary, not required by the contract, and never should have been provided (app. supp. R4, tab 4 at 3-4). Mr. Rathbun further conveyed his view that, if the government felt that the specifications that it provided in the contract (and which Rex was following) were deficient and that it wished Rex to provide documents that would remedy that problem, it should do so by change order (*id.*). On the same date, Mr. Rathbun also sent a letter to the government technical personnel who had been involved in the technical conversation and informed them of his view that it was improper and beyond the scope of the contract (*id.* at 10-11).

15. There was no written government response to these letters until 4 March 2013 when the CO sent Rex a contract modification terminating the contract for convenience (app. supp. R4, tab 9, ¶ 19).[2] This modification specified that the contract was being terminated, in full, pursuant to FAR 13.302-4 and FAR Part 49 (*id.*).

16. The parties attempted to settle the termination costs, but were unsuccessful. In its termination settlement proposal dated 16 July 2014, Rex sought in total $57,381.50 (R4, tab 13 at G-79). On 1 August 2015, the government's termination contracting officer (TCO) offered $25,231.94 to Rex (supp. R4, tab 24). This $25,231.94 represents $24,614.08 for costs deemed allowable that were incurred in performing the contract prior to termination minus a $64.41 projected loss on those costs plus settlement expenses of $1,218.00 and minus disposal credits of $535.73 for the materials purchased to perform the contract (supp. R4, tab 24 at G-189-93).

---

[1] The record is not particularly clear, but we believe the Raytheon specifications referenced involved the MK-49 legacy system for which the semiconductor devices were being built.

[2] The modification terminating the contract for convenience is dated 25 February 2013 (R4, tab 3 at G-46). Whether this modification was provided to Rex on 25 February or 4 March as alleged in the declaration provided by Rex (*see* app. supp. R4, tab 9, ¶ 19) is of no material difference to the outcome of this appeal. Rex's internal records indicate that it was informed by telephone of the intended termination for convenience on 22 February 2013 (app. supp. R4, tab 1 at 2).

5

17. Although Rex did not agree to this lower government figure, it did invoice and collect that amount from the government (supp. R4, tab 25), thus, $32,149.56 remains in contention here. We thus conclude, that on 1 August 2015, the parties were at an impasse with respect to Rex's termination settlement proposal and it ripened into a claim. Matters of dispute that remain to be resolved here were Rex's request for payment (minus a small credit for re-use) for the materials that were obtained for the entirety of the production of the contract, which the TCO disallowed as being precluded by the First Article Test clause; Rex's "DELAY" damages, which the TCO found non-applicable; Rex's request for profit, which the TCO determined inapplicable because he believed that Rex would have lost money on the contract; and the extent of Rex's settlement costs (R4, tab 13 at G-76).

18. With respect to Rex's demand for profit, the TCO created a table projecting the costs to complete the contract that will prove important below. In this table, he determined that:

a. The costs of materials to complete the contract were incurred prior to termination and were $10,714.68 (supp. R4, tab 24 at G-190). With the addition of the material burden of 15.99%, the material costs increased to $12,427.96 (id.).

b. Labor to complete the contract was determined to be $1,194.62 in direct labor costs already incurred (for creating the first article), plus the anticipated cost of producing the remaining seven articles, which was calculated at $546.21 in direct costs for a total of $1,740.83 (supp. R4, tab 24 at G-190). This number came from taking Rex's estimate of $68.27 in projected labor costs for producing each unit[3] and multiplying by 8, the number of units to be produced (id.).[4] The manufacturing burden in this table was 394.85% of labor costs, which, when multiplied by the already-incurred and projected direct labor costs ($1,740.83 x 394.85%), produces a total of $6,873.67 in indirect costs attributable to labor (id.). Adding the direct labor costs of $1,740.83 to its indirect costs of $6,873.67 to the fully burdened material costs of $12,427.96 sums to $21,042.46 (id.).

c. General and administrative (G&A) costs of 90.10% of the above total added $18,959.26 to the costs in the TCO's table (supp. R4, tab 24 at G-190). The TCO also included the miscellaneous costs of UID marking ($50.00), labels ($16.00), the cost of money ($197.20), and delivery ($1,941.52) (id.).

d. In sum total, then, the TCO found that the estimated cost to Rex for completing the contract would have been $42,206.44, which was $110.44 more than the contract price of $42,096.00 (supp. R4, tab 24 at G-190).

---

[3] (See SOF ¶ 19, below).

[4] There is a 5 cent discrepancy due to rounding errors.

6

19. The most significant costs in the TCO's profit calculation table came directly from information provided by Rex. The direct material costs in the TCO's table of $10,714.68 are consistent with Rex's allegations in this case (*see* app. supp. R4, tab 9, ¶ 20). The already-incurred direct labor costs in the TCO's table come from Rex's claim (*see* app. supp. R4, tab 7, ex. 1). The per unit cost of manufacturing the production items come from Rex's bid estimate that the production units would each require 3.08 hours to assemble and 1.28 hours to test (supp. R4, tab 23 at G-172). At the labor rates in Rex's estimate ($15.14 for assembly, $16.91 for testing (*id.*)), each assembly would then cost $68.27 in direct labor ($46.63 in assembly labor plus $21.64 for testing labor). The material and manufacturing burden rates in the TCO's table came from Rex's settlement proposal (*see* supp. R4, tab 24 at G-190), and were higher than those in its bid estimate (compare burden rates in bid estimate, supp. R4, tab 23 at G-172 to those in Rex's settlement proposal, app. supp. R4, tab 7, ex. 3 and R4, tab 16 at G-109). Finally, the G&A rate also came from Rex's settlement proposal (app. supp. R4, tab 7, ex. 4).

20. Turning to the settlement expenses, Rex submitted to the TCO termination settlement expenses of $2,717.55 for the labor of individuals who assembled the termination settlement proposals (multiplied by the proper G&A factor) plus the costs of its outside attorneys, who performed work on the proposal prior to this litigation (app. supp. R4, tab 9, ¶ 21e.). The TCO disallowed all of the costs of Rex's salaried employees ($1,137.05) under the belief that their salaries were already being paid by G&A for the contract and thus were precluded by FAR 31.205-42(c)(5), but allowed almost all of the legal fees except for a small amount ($362.50) that involved litigation before the Board, which the TCO considered not to be recoverable (supp. R4, tab 24 at G-192-93). Rex has since submitted unrefuted evidence that the salaries of the employees for the time that they worked on settlement of this dispute were not part of the G&A pool applied to this contract, nor were they paid by any other contract (app. supp. R4, tab 9, ¶ 21e.).

21. On 27 October 2014, Rex filed a notice of appeal from the deemed denial of its claim which was docketed as ASBCA No. 59624.

## DECISION

Typically, entitlement to compensation for costs in a termination for convenience is determined by those applicable clauses of the FAR that are incorporated into the contract at issue. With respect to the FAR clauses governing termination costs, the parties appear to have, *sub silentio*, treated this case for the most part as if the termination were covered by the termination clause for firm-fixed-price contracts in FAR Part 49[5] (*see, e.g.*, gov't br. at 17). In fact, however, the termination clause contained in the

---

[5] This is not surprising, given that the contract modification terminating it referenced FAR Part 49 (SOF ¶ 15).

contract is that for simplified acquisitions other than commercial items, FAR 52.213-4(f) (*see* SOF ¶ 4). Under FAR Part 49, contracts are "essentially converted into cost-reimbursement contracts, when terminated for convenience." *See Dellew Corp.*, ASBCA No. 58538, 15-1 BCA ¶ 35,975 at 175,783-84. Here, the standard for recovery of termination costs is somewhat different: subject to other terms of the contract, the contractor is entitled to "be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges that...have resulted from the termination" (*see* SOF ¶ 4).

In prior decisions, we have considered the scope of the materially-identical termination clause for commercial items, FAR 52.212-4(f), *see, e.g., SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832, and we will apply the same reasoning to the termination clause presented by FAR 52.213-4(f) for simplified non-commercial acquisitions. In these earlier decisions, we analyzed the clause as providing for reimbursement under two prongs: the first prong being for the percentage of work performed prior to the notice of termination; the second prong being for costs (including settlement costs) "resulting from the termination." *See Dellew*, 15-1 BCA ¶ 35,975 at 175,784 (citing *SWR*, 15-1 BCA ¶ 35,832 at 175,223). In the case before us, because there were never any semi-conductor devices tested and deemed acceptable and delivered to the government, there is no way to pay Rex a percentage of its performance and the parties have made no attempt to set forth a percentage of performance.[6] Nevertheless, when (as here) the contractor incurs costs prior to termination without completing any percentage of the contract, we have read an equivalent FAR clause to permit the contractor to recover reasonable expenses incurred prior to termination under the theory that they constitute "costs resulting from the termination." *SWR*, 15-1 BCA ¶ 35,832 at 175,277-28; *Dellew*, 15-1 BCA ¶ 35,975 at 175,784. These costs (but not the settlement costs) are subject to profit. *See SWR*, 15-1 BCA ¶ 35,832 at 175,233. We examine each category of costs below.

I.  Rex is not Entitled to Costs of Production Materials Ordered Prior to First Article Acceptance

A contractor's entitlement to termination costs as set forth in FAR 52.213-4(f) is "subject to the terms of this contract." Under FAR 52.209-3, First Article Approval – Contractor Testing, which is included in the contract (SOF ¶ 3), Rex was explicitly warned that, "[b]efore first article approval, the acquisition of materials or components for...production of, the balance of the contract quantity is at the sole risk of the Contractor" and not allocable to the contract for purposes of a termination settlement (SOF ¶ 6). The NAVSUPWSSIA05 clause, also included in the contract (SOF ¶ 7), included similar provisions that prohibited compensation in a termination settlement

---

[6] *But see TriRAD Technologies Inc.*, ASBCA No. 58855, 15-1 BCA ¶ 35,898. Under the proper circumstances (not presented here) the government could be liable for a percentage completion of partially assembled items, even if they were not delivered to the government. *Id.* at 175,497.

8

for materials obtained for the assembly of production and even first article test devices if the materials were obtained prior to approval of first article test procedures (*id.*). Thus, by the terms of the contract, Rex was not entitled to compensation in a termination settlement for production materials purchased prior to approval of the first article testing. Indeed, under NAVSUPWSSIA05, Rex was not entitled to compensation of any materials purchased for production of the test article prior to approval of the test procedure.

The TCO, nevertheless, agreed to compensate Rex for materials purchased for the fabrication of the first article for testing (*see* supp. R4, tab 24 at G-176), and, because the government does not seek to revisit that determination here, we will not disturb it.

Rex argues that it should be compensated for the early purchase of the diodes because it had no choice in the matter if it wished to deliver the semiconductor devices on time (app. supp. R4, tab 9, ¶ 21a.). Rex argues the diodes had a 24-week lead time for delivery, which meant that production would not have met the contractual deadline if it had waited until first article approval prior to ordering them (*id.*; *see also* app. reply br. at 2-3).

Although this long lead time concern could explain why Rex *initially* expected to make an early diode order (*see* SOF ¶ 9 (24-week lead time initially anticipated)), it does not provide us a basis for ignoring the plain terms of the contract when determining what compensation is owed to Rex for the termination. Indeed, in multiple prior cases, we held that, absent waiver from the CO, a contractor was not entitled to payment for such costs incurred prior to first article acceptance. *See, e.g.,* *Basic Tool Co.*, ASBCA No. 29683, 88-2 BCA ¶ 20,638 at 104,321 (citing *Century Electronics*, ASBCA No. 29123, 85-3 BCA ¶ 18,232 at 91,550); *Aerospace Swaging & Mfg., Inc.*, ASBCA No. 38534, 90-2 BCA ¶ 22,834 at 114,656. Neither party alleged a waiver by the CO here, and when Rex entered the contract, it was well aware of the risks it would undertake if it chose to order its diodes prior to first article acceptance. It took those risks and must live with the consequences. Rex's argument that "[t]he Government Should Not Be Allowed to Hide Behind the [First Article Test] Clauses" (*see* app. reply br. at 3), is not persuasive. The terms of the contract are binding upon the parties unless waived, and the unsupported allegation that the government withheld approval of the test procedures "in pursuit of this improper purpose" (*see id.*), even if true (but which we find unproven) would not change the simple fact that the contract forbids payment for production items obtained prior to such approval.

Moreover, although the contract terms are sufficient to preclude recovery to Rex on this issue, we further note that the evidence demonstrates that Rex was not, in fact, saddled with a 24-week lead time for the subject diodes. When Rex contacted the diode supplier in August 2012, it was offered a delivery with a six-week lead time (*see* SOF ¶ 9), although the diodes were actually delivered in less than four weeks (*id.*). Thus, at

9

the time that it placed its order for the diodes, Rex was on notice that it need not worry about a 24-week lead time, and that the diodes could be delivered in plenty of time to meet its production time-lines if ordered subsequent to first article testing approval.

II.    Rex is Not Entitled to the Delay Damages that it Seeks

While Rex submitted a claim for delay damages as part of its termination settlement proposal, we do not have evidence that such costs resulted from the termination. We do however consider whether Rex is otherwise entitled to such costs under some other contract provision. Undoubtedly, the government was delinquent in responding to Rex's first article and production test procedures submitted on 27 September 2012 (finding 10)—indeed, there was no response at all from the government except that the contract was terminated some three months after the response was due. This lack of response might justify a change to the contract delivery dates (*see* SOF ¶ 5) and potential damages, if they could be proved. But the delay damages sought by Rex are limited to unabsorbed overhead (*see* app. supp. R4, tab 9, ¶ 21b.) and there is simply no basis to award such damages based upon the record before us.

The government's responsibility for unabsorbed home office overhead in a delay case was principally articulated in *Eichleay*,[7] and in numerous cases that later followed in the United States Court of Appeals for the Federal Circuit. *See, e.g.*, *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed. Cir. 1993); *Melka Marine, Inc. v. United States*, 187 F.3d 1370 (Fed. Cir. 1999); *P.J. Dick Inc. v. Principi*, 324 F.3d 1364 (Fed. Cir. 2003); *Nicon, Inc. v. United States*, 331 F.3d 878 (Fed. Cir. 2003). The general notion is that the government is liable to the contractor for a proportionate share of the general costs of operating the contractor's business (things like accounting and payroll services, salaries for upper-level managers, general insurance, utilities, taxes and depreciation, *see Interstate*, 12 F.3d at 1058), during the time that the contractor was forced to do little but twiddle its thumbs due to the delay. *See Melka Marine*, 187 F.3d at 1374-75. A prerequisite to this entitlement, however, is that the contractor truly was forced to remain on standby during the delay period and was precluded from obtaining new business. *Melka Marine*, 187 F.3d at 1375 (citing *Interstate*, 12 F.3d at 1056); *P.J. Dick*, 324 F.3d at 1370; *Nicon*, 331 F.3d at 883. Rex was not so affected by the government.

Rex argues in the Kornesczuk declaration that it could not obtain new work during the delay period because it was "required to standby" at that time and maintain its resources at the ready to perform and that, in any event, its business model was to sit by and let its customers place orders – a matter over which it argues that it had no control (app. supp. R4, tab 9, ¶ 21b.). Perhaps its passive business model did not lend itself to Rex's seeking new work during the delay period, but that was not the fault of the government. Moreover, nothing about the government delay here imposed upon

---

[7] *Eichleay Corp.*, ASBCA No. 5183, 60-2 BCA ¶ 2688.

Rex a standby that required it to incur additional costs. In *P.J. Dick*, the Federal Circuit discussed, at length, the meaning of "standby" for purposes of *Eichleay* damages. *See* 324 F.3d at 1371-72. This discussion makes clear that a contractor is considered to be on standby if, "during that delay it was required to be ready to resume work on the contract, at full speed as well as immediately." *Id.* at 1371. Thus, there would be no standby if the government permitted the contractor "a reasonable amount of time" to remobilize once the suspension was lifted. *Id.* Factually, Rex had ample time to complete the little work necessary to fulfill the requirements of the contract and need not have been on standby.

Our basis for this conclusion is two-fold. First, the First Article Testing clause, FAR 52.209-3(f), requires the CO to provide for an extension of time if the government was late in approving the first article test procedure (SOF ¶ 5) ("If the Government does not act within the time specified [for approval of first article test procedure] the Contracting Officer shall...equitably adjust...the delivery or performance dates."). This provision thus gave Rex every reason to believe that the government would have given it "reasonable time," *see P.J. Dick*, 324 F.3d at 1371, to complete the work.

Our second factual reason to conclude that Rex had ample time to complete the contract without needing to keep its work force "ready to resume work on the contract, at full speed as well as immediately," *P.J. Dick*, 324 F.3d at 1371, is based upon a straightforward review of the calendar and the minimal work remaining to be performed upon the contract. At the time that the contract was terminated, it was approximately seven months into performance, with the first article having been already (and prematurely) fabricated and tested by Rex (SOF ¶ 11). After delivery and approval of the first article and its tests, all that remained for the next five months of performance was the fabrication, testing, and delivery of the seven remaining semiconductor devices. In the Kornesczuk declaration that serves as its opening brief, Rex characterizes the work remaining to be done on these devices as "insubstantial" (app. supp. R4, tab 9, ¶ 21b.). We agree. Rex estimated that the production units would each require 3.08 hours to assemble and 1.28 hours to test (SOF ¶ 19), which would yield slightly more than 30 hours of work to fabricate and test the remaining 7 devices ($7 \times (3.08 + 1.28) = 30.52$). We cannot conclude that Rex kept its workforce on tenterhooks to immediately ramp up "at full speed" in order to perform 30 hours of work in the coming 5 months (even if the CO had refused to grant the extension required by FAR 52.209-3(f)).[8] Thus, by no meaning of the word applicable to the

---

[8] In its reply brief, Rex argues that it needed to keep its workforce on standby because time was of the essence and it needed to avoid a negative performance rating that would follow if it were late (*see* app. reply br. at 2). Given the ample time remaining on the contract and the minimal work remaining upon the contract, we find this argument farfetched.

11

*Eichleay* analysis, was Rex on "standby." Accordingly, Rex has not proved itself entitled to delay damages for unabsorbed overhead.

## III.    Rex was Entitled to Very Little Profit in the Termination Settlement

Even though Rex is entitled to profit for its "costs resulting from termination," *see SWR*, 15-1 BCA ¶ 35,832 at 175,233, there is no basis for compensating Rex at a higher profit margin than it would have earned had the contract not been terminated. The facts here demonstrate that that margin would have been far smaller than claimed by Rex. The documents that Rex submitted to support its claim for expenses incurred prior to the termination of the contract reflected higher labor and material costs than anticipated in its bid. In particular, the burdens for both were substantially higher than expected[9] and, when the remaining labor required to complete the contract is factored in to our calculations, we find that Rex would have barely eked out a profit on the contract, had it been completed.

The accounting supporting this conclusion comes from a straightforward review of the costs already incurred upon the contract added to the remaining costs for the contract. The TCO included a depiction of this calculation in a table contained in his 1 August 2015 determination (SOF ¶ 18). We have reviewed the numbers in this table and find them to be (mostly) supported and accurate (*see* SOF ¶ 19), but depart from them in one instance that changes the negative profit to a very small profit: the TCO calculated the wrong number of production items remaining on the contract.

Because Rex had already completed its first article at the time of contract termination (*see* SOF ¶ 11), it only needed to make seven more of the semiconductor devices required by the contract, but the TCO's table assumed that eight more devices needed to be made (*see* SOF ¶ 18). Accordingly, the labor costs (fully burdened and subjected to G&A markups) for one device should be subtracted from the TCO's projected bottom line. The direct labor costs for one item were $68.27 (*id.*), to which should be added the 394.85% labor burden and the 90.10% G&A cost (*id.*). Mathematically, we may represent that as $68.27 x 4.9485 x 1.901. The result is $642.22 in extra costs for the one over-counted production item. We thus change the TCO's projected $110.44 loss (*see id.*) into a $531.78 profit.

Since the contract price was $42,096 (*see* SOF ¶ 1), by application of simple division, we can see that the proper expected profit rate would have been 1.26% instead of the TCO's negative profit rate. We multiply this profit rate against the TCO's

---

[9]  Rex argues that its past experience and its estimate demonstrate that it would have made substantial profit on this contract (*see* app. reply br. at 3-4). The problem with this contention is that it utterly ignores the reality of its contract performance, which encountered vastly increased burden rates than those used to formulate Rex's bid (SOF ¶ 18).

calculated allowable costs incurred prior to termination, $24,614.08 (SOF ¶ 16), and determine that the TCO should have paid $310.14 in profit to Rex, rather than withholding $64.41 in loss, which is a net difference of $374.55.

## IV.    Rex was Entitled to Additional Reimbursement for Settlement Expenses

Rex submitted termination settlement expenses of $2,717.55 for the labor of individuals who assembled the termination settlement proposals (multiplied by the proper G&A factor) plus the costs of its outside attorneys, who performed work on the proposal prior to this litigation (SOF ¶ 20). The TCO disallowed all of the costs of Rex's salaried employees ($1,137.05) under the belief that their salaries were already being paid by G&A for the contract, but allowed almost all of the legal fees except for a small amount ($362.50) that involved litigation before the Board and would be precluded by FAR (id.). Rex does not appear to challenge the determination regarding legal fees, but does take issue with the notion that it should not be able to charge for the time of its employees whose salaries were part of the G&A pool (app. supp. R4, tab 9, ¶ 21e.). Because the work on the settlement proposal took place in a different year than performance of the contract and the evidence of record is that it was not charged to any other government contract (SOF ¶ 20), Rex is entitled to the money.

Without getting too far into the weeds of cost accounting, the general premise of FAR 31.205-42(c)(3), which was relied upon by the TCO to deny this portion of Rex's claim (SOF ¶ 20)[10] is that, if particular labor costs were incurred for work on a particular contract and paid as a direct cost on that contract for its termination, those labor costs cannot also be placed into the pool of costs used to generate G&A expenses. *See* FAR 31.205-42(c)(3). To put a finer point on it, a contractor cannot be paid twice for the same labor expense. In a somewhat obscure manner, the TCO found and the government argues that the personnel who performed work on the termination settlement were all persons whose positions would have placed their salaries into the G&A expense pool (SOF ¶ 20). The TCO then alleges that, because these expenses were incurred prior to 2015 and not, apparently, charged to the contract, they were part of the G&A pool and presumably recovered in the years in which they were incurred (id., *see also* gov't br. at 19-20). The flaw in this reasoning is that the government has not demonstrated that G&A costs were ever recovered by Rex from the government (or any other customer, for that matter) during the years that Rex incurred its settlement expenses. Rex has provided unrefuted evidence that it did not otherwise recover these settlement expenses (SOF ¶ 20). Accordingly we find that Rex did not recover its internal settlement expenses of $1,137.05 (SOF ¶ 20), and that this expense,

---

[10] Under the applicable termination clause, FAR 52.213-4(f), cost accounting standards are not necessarily applicable to this termination settlement. Neither party raises the issue and because we rule in favor of Rex here, we need not decide whether it was appropriate for the CO to consider FAR 31.205-42(c)(3) in the first instance.

which we find to be reasonable under the circumstances, should have been paid. Accordingly, Rex is entitled to an additional $1,137.05 in settlement expenses.

## CONCLUSION

We find that Rex is entitled to an additional $374.55 for lost profit and $1,137.05 in settlement expenses for a total of $1,511.60, plus CDA interest from 1 August 2015, the date the termination settlement proposal matured into a claim.

Dated: 15 April 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59624, Appeal of Rex Systems Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals